TRANS WORLD METALS, INC., Trans-World Metals and Co. Limited, and Trans World Metals, Limited, Plaintiffs-Appellees,

v.

SOUTHWIRE COMPANY, Defendant-Appellant.

Docket No. 84–7856.

United States Court of Appeals, Second Circuit.

Argued April 2, 1985.

Decided Aug. 5, 1985.

James H. Bratton, Jr., Atlanta, Ga. (John G. Despriet, Jane Childs Carr, Edward H. Wasmuth, Jr., Smith, Gambrell & Russell, Atlanta, Ga., Bud G. Holman, John J. Quinn, Kelley Drye & Warren, New York City, on brief), for defendant-appellant.

Howard A. Rosenstein, New York City (Jerry Oppenheim, Eric C. Rubenstein, Miriam B. Chaloff, Sol Herskowitz, Oppenheim & Rosenstein, P.C., New York City, on brief), for plaintiffs-appellees.

Before FEINBERG, Chief Judge, VAN GRAAFEILAND and NEWMAN, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal requires us to resolve an expensive dispute arising out of the repudiation of a long-term commodity supply contract. Southwire Company ("Southwire") appeals from a judgment of the District Court for the Southern District of New York (Charles E. Stewart, Jr., Judge) entered in this diversity action following a four-week jury trial. The jury awarded plaintiffs Trans World Metals, Inc., Trans-World Metals & Co., Ltd., and Trans World Metals, Ltd. (collectively "Trans World") approximately $7.1 million in damages. Southwire challenges the finding that it is liable to Trans World under the contract, the measure of damages awarded to Trans World, and various rulings by the District Court. We affirm.

## BACKGROUND

On April 7, 1981, Trans World and Southwire negotiated by telephone for the purchase and delivery in 1982 of approximately $20.4 million of aluminum. The parties confirmed the contract by exchanging unsigned, standard form documents: Trans World sent Southwire both a confirming telex and a similarly worded "sales contract"; Southwire sent Trans World a "purchase contract confirmation." The contract documents reflect an agreement for the sale and delivery of twelve thousand metric tons of primary aluminum at an average price of $.77 per pound. The "delivery time" clause of the Trans World sales contract and the "shipment schedule" clause of the Trans World telex both state that delivery shall occur "[a]t the rate of 1000 mt [metric tons] per month from January 1982 through December 1982." The

Southwire purchase contract confirmation indicates that the quantity and "expected date" under the agreement is 2,205,000 lbs. (one thousand metric tons) "Per Month." The standard printed form on the reverse side of the purchase contract confirmation indicates, in the "Delivery" clause, that "Time is hereby made of the essence, any late delivery shall be a default, and Seller shall be fully responsible for any cost occasioned Buyer thereby."

Also pertinent to the delivery obligation is the following clause in the Trans World sales contract:

> Delivered Railhead, usual midwest U.S.A. destinations *as per buyer's instructions, which are to be submitted no later than the 15th of the month of shipment.* Any tonnage not released by that date is to be invoiced on the last day of month on net 30 days terms.

(Emphasis added). The purchase contract confirmation contained similar language.

The Southwire purchase contract confirmation contained a "termination" clause with the following provision regarding untimely delivery:

> (a) Buyer may, by written notice of default, cancel this contract in whole or in part if:
>
> (1) Seller fails to make timely delivery, time being of the essence; or
>
> (2) Seller fails to comply with any provision thereof; and
>
> Seller fails to cure such failure within ten (10) days, or such longer period as may be specified in the notice, from the date of receiving the notice.

Pursuant to the delivery terms of the contract, Southwire sent Trans World several delivery instruction "releases" during January 1982. Trans World shipped about three-fourths of the first month's one thousand metric tons of aluminum during January. The remaining one-fourth of the first one thousand tons of metal was shipped between February 1 and February 11, 1982. On February 17, 1982, representatives of Trans World attended a meeting at Southwire's request in Carrollton, Georgia, at which Southwire sought to extend the length of the contract to two years without altering the total quantity of aluminum to be delivered. The parties did not discuss the late delivery of the aluminum ordered in January. Southwire sent no delivery instruction releases to Trans World after January 1982.

Between April 1981, when the contract was negotiated, and March 1982, the price of aluminum fell dramatically. On March 4, 1982, Southwire sent Trans World a telex repudiating the entire contract, pursuant to the termination clause of the purchase contract confirmation. The telex stated:

> Pursuant to [the termination clause] of our contract ... Southwire Company hereby notifies you of default in your performance of said contract and cancels the same because of your failure to make timely delivery of material called for by said contract.
>
> Please advise us how to dispose of material you have late shipped, which we hold for your instruction.

The "failure to make timely delivery" refers to shipments to be made during the first month of the twelve-month contract. The "late shipped" material consists of the $419,232.84 worth of aluminum shipped by Trans World in early February 1982.

On May 3, 1982, Trans World brought suit in New York state court against Southwire for breach of the aluminum supply contract.[1] Southwire removed the action to federal court and unsuccessfully sought to transfer the case to Georgia. At the conclusion of the trial the jury answered special interrogatories in addition to rendering a general verdict in favor of Trans World.

---

1. Southwire had earlier brought a similar action against Trans World in the Northern District of Georgia. The day after repudiating the supply contract, Southwire filed suit seeking a declaratory judgment that the contract was of no force and effect. The District Court for the Northern District of Georgia dismissed for lack of personal jurisdiction. The Eleventh Circuit reversed that judgment after the action in the Southern District of New York had gone to trial. *See Southwire Co. v. Trans World Metals & Co., Ltd.,* 735 F.2d 440 (11th Cir.1984).

The jury found that the parties had entered into a contract but that the "time is of essence" and "termination" clauses of Southwire's "purchase contract confirmation" were not a part of the contract. The jury could not agree whether the aluminum shipments made in early February were timely but found that, even if the shipments were late, they were accepted by Southwire and that there was no substantial impairment of the value either of any particular shipment or of the contract as a whole. The jury awarded Trans World total damages of $7,122,141.84, consisting of $6,702,529.00 for repudiation of the remaining purchase obligations of the contract and $419,232.84 for shipments accepted without payment by Southwire in February.[2] The District Court applied the New York prejudgment interest rate and awarded Trans World $1,304,804.88 in prejudgment interest, for a total of $8,426,946.72. The District Court denied Southwire's motions for judgment notwithstanding the verdict and for a new trial. This appeal followed.

## DISCUSSION

### I.

Southwire challenges the jury's finding that it is liable for repudiation of the contract, arguing that the District Court should have ruled as a matter of law that Trans World breached the contract by failing to complete the first month's shipments in January. Southwire argues, in essence, that the deliveries made in February violated the "delivery" and "termination" clauses of its purchase contract confirmation and therefore that it was error for the District Court to permit Trans World to introduce evidence regarding trade practices in order to show that the February deliveries were timely. Even if we ignore the jury's findings that the "time is of the essence" and "termination" clauses were not part of the contract between the parties, Southwire's argument fails.

■ First, because the provisions governing the timing of delivery are somewhat ambiguous, the District Court correctly admitted parol evidence regarding the contract meaning of the terms. *See Rose Stone & Concrete, Inc. v. County of Broome*, 76 A.D.2d 998, 999, 429 N.Y.S.2d 295, 296 (3d Dep't 1980) ("[T]rade terms may be shown by parol evidence to have acquired a meaning by usage."); *cf. Long Island Airports Limousine Service Corp. v. Playboy-Elsinore Associates*, 739 F.2d 101, 103–04 (2d Cir.1984) (non-U.C.C. case; parol evidence admissible when contract susceptible of at least two fairly reasonable meanings); *Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 9 (2d Cir.1983) (same). The contract provides for delivery at a rate of 1,000 metric tons per month, but the apparent certainty of this provision is undermined by the provision regarding delivery instructions from the buyer. It is not self-evident from reading both provisions whether 1,000 metric tons are to be delivered precisely within each calendar month or whether some part of each month's shipment may be delivered in the following month so long as it is shipped within a reasonable time after receipt of delivery instructions. At a minimum the delivery provisions were permissibly "explained or supplemented" by evidence of trade usage. N.Y.U.C.C. Law § 2–202(a) (McKinney 1964); *see Flower City Painting Contractors, Inc. v. Gumina Construction Co.*, 591 F.2d 162, 165 (2d Cir. 1979); *Edison v. Viva International, Ltd.*, 70 A.D.2d 379, 383, 421 N.Y.S.2d 203, 205 (1st Dep't 1979); N.Y.U.C.C. Law § 1–205(3).

■ Second, the termination clause in Southwire's purchase contract confirmation explicitly affords Trans World a right to cure "within ten (10) days ... from the date of receiving [written] notice" of default. Southwire provided no written notice of default before March 4, when it sent Trans World the telex repudiating the contract. Because Trans World had cured any potential default by completing all request-

2. The component figures total $380 less than the aggregate figure awarded by the jury. The dis-

crepancy has not been noticed by the parties, which we take to be a waiver of any complaint.

ed deliveries before the period for cure expired, the contract does not permit Southwire to terminate on the basis of the shipments made in February.

■ Finally, the Uniform Commercial Code offers Southwire no ground to repudiate the contract. The agreement at issue is an "installment contract" within the meaning of N.Y.U.C.C. Law § 2–612(1) because it "requires or authorizes the delivery of goods in separate lots to be separately accepted." Therefore, Southwire may treat a late shipment of one installment as a breach of the entire contract only if the "default with respect to one or more installments substantially impairs the value of the whole contract." *Id.* § 2–612(3). The jury's finding, not challenged by Southwire on appeal, that there was no substantial impairment of the value of either the shipments received in February or the contract as a whole supports the ultimate finding that Southwire breached the contract. The District Court properly refused to overturn the jury verdict against Southwire.

## II.

Southwire complains that the damage award, calculated by the difference between contract and market prices, gave Trans World an unwarranted windfall. Southwire favors an alternative measure of damages based on the rate of profit earned by Trans World on the first month's completed shipments projected over the twelve-month life of the contract. Such a measure, Southwire argues, would better estimate the amount Trans World would have made had the contract been completed. We reject this alternative as contrary to the Uniform Commercial Code.

Seller's damages for repudiation are governed by section 2–708 of the Uniform Commercial Code. Subsection 1 of this section sets forth the general rule that damages are to be calculated by the difference between the contract and market prices:

(1) Subject to subsection (2) and to the provisions of this Article with respect to proof of market price (Section 2–723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (Section 2–710), but less expenses saved in consequence of the buyer's breach.

N.Y.U.C.C. Law § 2–708(1). The drafters of the Uniform Commercial Code recognized that this measure would not adequately compensate certain types of sellers, generally referred to as "lost volume sellers." *See* J. White & R. Summers, Uniform Commercial Code § 7–9, at 274–76 (2d ed. 1980) ("White & Summers"). Therefore, an alternative measure of damages was provided for those sellers who would be *inadequately* compensated by the standard contract/market price differential:

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (Section 2–710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

N.Y.U.C.C. Law § 2–708(2). This measure of damages is often preferred by sellers who have not acquired the goods to be sold prior to the buyer's repudiation because such sellers often would be undercompensated by the contract/market price measure of damages.[3]

---

**3.** Professors White and Summers refer to such sellers as "jobbers."

> By "jobber" we refer to a seller who satisfies two conditions. First, he is a seller who never acquires the contract goods. Second, his decision not to acquire those goods after learning of the breach is commercially reasonable under 2–704.... Since he has no goods on hand to resell, he cannot even resell on the market at the time of tender and so recoup the amount necessary to make him whole by adding such proceeds to his 2–

Southwire argues that the "lost profits" measure should also apply when the seller would be *overcompensated* by section 2–708(1). We disagree. We do not doubt that the contract/market price differential "will seldom be the same as the seller's actual economic loss from breach." White & Summers § 7–7, at 269; *see* Peters, *Remedies for Breach of Contracts Relating to the Sale of Goods Under ·the Uniform Commercial Code: A Roadmap for Article Two*, 73 Yale L.J. 199, 259 (1963). However, nothing in the language or history of section 2–708(2) suggests that it was intended to apply to cases in which section 2–708(1) might overcompensate the seller. *See* White & Summers § 7–12, at 283. Nor has Southwire cited any New York case that interprets section 2–708(2) as Southwire urges us to interpret it. As a federal court sitting in diversity, we will not extend the application of this state law.

Nor are we convinced that Trans World has been overcompensated. No measure other than the contract/market price differential will award Trans World the "benefit of its bargain," that is, the "amount necessary to put [it] in as good a position as [it] would have been if the defendant had abided by the contract." *Western Geophysical Co. of America, Inc. v. Bolt Associates, Inc.*, 584 F.2d 1164, 1172 (2d Cir.1978) (quoting *Perma Research & Development Co. v. Singer Co.*, 402 F.Supp. 881, 898 (S.D.N.Y.1975), *aff'd*, 542 F.2d 111 (2d Cir.), *cert. denied*, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976)). The contract at issue in this case is an aluminum supply contract entered into eight months prior to the initial deliveries called for by its terms. The last of the anticipated deliveries of aluminum would not have been completed until a full twenty months after the negotiations took place. It simply could not have escaped these parties that they were betting on which way aluminum prices would move. Trans World took the risk that the price would rise; Southwire took the risk that the price would fall. Under these circumstances, Trans World should not be denied the benefit of its bargain, as reflected by the contract/market price differential.[4] *Cf. Apex Oil Co. v. Vanguard Oil & Service Co.*, 760 F.2d 417 (2d Cir.1985) (defaulting seller obliged to pay damages based on contract/market price differential).

The decision primarily relied upon by Southwire is distinguishable from this case. *Nobs Chemical, U.S.A., Inc. v. Koppers Co., Inc.*, 616 F.2d 212 (5th Cir.1980), involved a seller acting as a middleman. The seller in Nobs had entered into a second fixed-price contract with its own supplier for purchase of the goods to be sold under the contract sued upon; its "market price" thus had been fixed in advance by contract. Because the seller had contractually protected itself against market price fluctuation, the Fifth Circuit concluded that it would have been unfair to permit the seller to reap a riskless benefit. As that Court noted, "the difference between the fallen market price and the contract price is [not] necessary to compensate the plaintiffs for the breach. Had the transaction been completed, their 'benefit of the bargain' would not have been affected by the fall in the market price...." *Id.* at 215. Whether or not we would have reached the same result in *Nobs*, here the benefit of the bargain under a completed contract would have been affected by the fall in aluminum

---

708(1) recovery. Thus the only recovery which grossly approximates the "jobber's" economic loss is a recovery based on lost profits.

White & Summers § 7–10, at 278. In a case involving a commodity like aluminum that fluctuates rapidly in price—as compared to standard-priced goods like cars, *see* 67 Am.Jur.2d *Sales* § 1129—the lost profits of a selling jobber may well be adequately reflected by the contract/market price differential.

4. Southwire presented no evidence and made no claim concerning any expenses saved by Trans World as a result of Southwire's breach. Such expenses, if established, would have reduced the recoverable damages. N.Y.U.C.C. Law § 2–708(1); *see Katz Communications, Inc. v. The Evening News Association*, 705 F.2d 20, 26–27 (2d Cir.1983).

prices.[5] Because Trans World accepted the risk that prices would rise, it is entitled to benefit from their fall.

### III.

Southwire raises a number of further points on appeal. The first involves the proper determination of the market price for purposes of calculating the contract/market price differential. The jury relied upon Trans World's damage calculations, which were based on the market price as reflected by bids received on April 26 (and projections discussed below). Southwire argues that because the contract was repudiated on March 4, the market price figure used to calculate damages should be the March 4 price. We do not agree. The measure of damages set forth in section 2–708(1) is "the difference between the market price *at the time and place for tender* and the unpaid contract price." N.Y.U.C.C. Law § 2–708(1) (emphasis added); *cf. id.* § 2–713(1) (*buyer's* damages for repudiation by *seller* measured by contract/market price differential "at the time when the buyer learned of the breach"). Thus, the pertinent market price date is not the date of repudiation but the date for tender.

We would accept Southwire's argument that the date Trans World learned of the repudiation would be the correct date on which to calculate the market price had this action been tried *before* the time for full performance under the contract. *See* N.Y. U.C.C. § 2–723(1) (market price at time aggrieved party learned of repudiation used to calculate damages in action for anticipatory repudiation that "comes to trial before time for performance with respect to some or all of the goods"). However, where damages are awarded *after* the time for full performance, as in this case, the calculation of damages under section 2–708(1) should reflect the actual market price at each successive date when tender was to have been made under the repudiated installment contract. This was the rule prior to enactment of the Uniform Commercial Code. *United States v. Burton Coal Co.,* 273 U.S. 337, 340, 47 S.Ct. 351, 352, 71 L.Ed. 670 (1927) (following repudiation of supply contract, "seller may recover the difference between the contract price and the market value at the times when and the places where deliveries should have been made"); *L.W. Foster Sportswear Co. v. Goldblatt Brothers, Inc.,* 356 F.2d 906, 910 & n. 6 (7th Cir.1966) (recognizing same standard under pre-U.C.C. law and U.C.C. § 2–708); *see* 67A Am.Jur.2d *Sales* § 1115, at 505 n. 19 (2d ed. 1985); *id.* § 1118, at 510 n. 50. New York did not intend to deviate from this measure of damages upon adoption of the Uniform Commercial Code. The Official Comment to section 2–708 indicates that the "prior uniform statutory provision is followed generally in setting the current market price at the time and place for tender as the standard by which damages for non-acceptance are to be determined." N.Y.U.C.C. Law § 2–708 Official Comment 1. The "prior uniform statutory provision" indicated that where " 'there is an available market for the goods ... [damages should be measured by] the difference between the contract price and the market or current price ... when the goods ought to have been accepted, or, if no time was fixed for acceptance, then at the time of the refusal to accept.'" *Id.* § 2–708 Practice Commentary (quoting Sales Act § 64 (McKinney's Personal Property Law § 145)).

We therefore conclude that when calculating damages for a buyer's repudiation of an installment contract by the contract/market price differential, "time ... for tender" under section 2–708(1) is the date for each successive tender of an installment, as specified in the contract. *See* 67A Am.Jur.2d *Sales* § 1118, at 510 ("[W]here the breach is of an installment

---

**5.** Although Trans World had available to it about 78,000 tons of aluminum at the time of the breach, Trans World had corresponding obligations to deliver about 76,000 tons of aluminum to buyers other than Southwire. Absent any indication that Trans World had "identi- fied" any of this metal to the Southwire contract, *see* N.Y.U.C.C. Law § 2–501(b), we cannot say, as could the court in *Nobs,* that a change in the market price would not affect the seller's "benefit of the bargain."

contract, damages should be measured by the market price at the time of each delivery." (footnote omitted)). In this case the successive dates for tender were the last day of each month in 1982, at which time Trans World was authorized to invoice that month's shipments even if such shipments had not been "released" by Southwire's delivery instructions. A contract/market price differential should have been calculated for each month during 1982.

■ We recognize that the jury relied upon a damage calculation prepared for Trans World that did not use actual market prices for each month of scheduled tenders. Instead, Trans World's expert took the actual price for April 1982 and projected forward from that date "anticipated" increases of $15 per metric ton for each month thereafter. Though the use of such an estimate was inappropriate because the actual market price for each successive month was known by the date of the trial, Southwire has no basis for complaint. Trans World's projected monthly market prices were closer to the contract price than were the actual market prices. Trans World therefore received less in damages using its expert's projection than it would have received using the correct measure. Furthermore, Southwire did not preserve at trial the factual issue as to the correct market price on each successive date of tender. Southwire did not object to Trans World's use or the accuracy of projected prices nor otherwise raise the issue with the jury, relying instead on its unsuccessful effort to convince the jurors that the contract/market price differential was not an appropriate method for calculating damages. Having failed to preserve the point for appeal, Southwire may not now raise the issue for the first time. *See, e.g., Schmidt v. Polish People's Republic,* 742 F.2d 67, 70 (2d Cir.1984).

■ Southwire contends that it was improper for the District Court to award prejudgment interest because Georgia law governs this case and Georgia does not permit prejudgment interest except on liquidated damages. *See United States ex rel. Georgia Electric Supply Co., Inc. v. United States Fidelity and Guaranty Co.,* 656 F.2d 993, 997 (5th Cir.1981). Southwire argues that Georgia law applies to this case both because of the inclusion of a choice-of-law provision on the back of the purchase contract confirmation and because under New York choice-of-law rules Georgia is the place of "most significant contacts." *See, e.g., Transatlantic Cement, Inc. v. Lambert Freres et Cie,* 462 F.Supp. 363, 364–65 (S.D.N.Y.1978). In ruling on this issue the District Court stated that "[i]n view of the numerous contacts with the State of New York, we believe that New York law is applicable, that plaintiffs are entitled to [prejudgment] interest and the appropriate rate is nine percent per annum." Because the District Court would not have undertaken this conflict-of-laws analysis had it determined that the choice-of-law provision in the purchase contract confirmation was part of the contract between the parties, we take the District Court's statement as an implicit ruling that, like the delivery time and termination clauses of the purchase contract confirmation, the choice-of-law provision was not part of the contract. This implicit finding is not clearly erroneous. Nor can we say that the choice-of-law ruling was in error. Though both Georgia and New York had contacts with this transaction, it would be anomalous to reject the holding that New York was the state with the *most* significant contacts when there was serious doubt that Trans World had sufficient contacts in Georgia even to subject it to personal jurisdiction there. *See* note 1, *supra.*

■ Southwire asserts that the District Court violated the "rule of sequestration" of Federal Rule of Evidence 615[6] by permitting Reuben, the managing director of Trans World Metals, Ltd., to rebut the testimony of Southwire's damage expert, Lawlor. Reuben was not excluded from the courtroom during Lawlor's testimony regarding damages, which Reuben later re-

**6.** Federal Rule of Evidence 615 provides:
  At the request of a party the court shall order witnesses excluded so that they cannot

hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a

butted. Reuben may well have been entitled to remain pursuant to the exception in Rule 615(3) for a person whose presence is essential to the presentation of a case, *see Morvant v. Construction Aggregates Corp.,* 570 F.2d 626, 629–30 (6th Cir.) (generally unnecessary to exclude expert from courtroom), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978). He was not a fact witness whose recollection might have been colored by accounts of prior witnesses. In any event, the failure of Southwire to point out any manner in which Reuben's rebuttal testimony was different from his earlier testimony on direct examination demonstrates that Southwire suffered no prejudice from admission of the rebuttal testimony.

We have considered Southwire's remaining claims and find them to lack merit. The judgment of the District Court is affirmed.

party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause.