**UNION CARBIDE CORPORATION, Plaintiff,**

v.

**CONSUMERS POWER COMPANY, Defendant.**

**Civ. A. No. 82CV–60248–AA.**

United States District Court, E.D. Michigan, S.D.

June 11, 1986.

Theodore A. Souris, James A. Smith, Bodman, Longley & Dahling, Detroit, Mich., for plaintiff.

John L. Collins, William R. Schulz, Foster, Swift, Collins & Coey, P.C., Lansing, Mich., O. Keith Petersen, John P. Dickey, Jackson, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This dispute arises out of a contract between Union Carbide Corporation ("Union Carbide") and Consumers Power Company ("Consumers") for the purchase of large quantities of residual fuel oil. Plaintiff Union Carbide alleges that Consumers breached this contract by refusing to accept further deliveries of the oil. Both parties have filed motions asking this court to determine the appropriate measure of damages to be applied if a breach is determined to have occurred.

FACTUAL BACKGROUND

The facts of the case which are relevant to these motions are largely agreed upon. There are two major contracts involved: one between Union Carbide and Consumers, and the other between Petrosar Limited ("Petrosar") and Union Carbide. On September 5, 1980, Union Carbide and Consumers entered into a contract whereby Union Carbide would deliver, and Consumers would purchase, 10,000 barrels of residual fuel oil per day until December 31, 1987. Union Carbide's oil supplier was Petrosar.

After the contract was signed, and deliveries begun, there was a dramatic drop in the price of residual fuel oil which was not passed through to Consumers. Thus, Consumers was paying prices well in excess of the market price for the oil it received from Union Carbide. In late 1981, Consumers

announced that it would refuse to take any further deliveries of residual fuel oil after December 31, 1981. Union Carbide made sporadic efforts to resell the oil Consumers refused until August 27, 1982. Union Carbide then cancelled the contract under the terms of Uniform Commercial Code (UCC) § 2–703(f) [Mich.Comp.Laws.Ann. § 440.-2703].[1] In lieu of accepting further deliveries of oil previously sold to Consumers, Union Carbide paid Petrosar to keep the oil. These payments were called residual oil reduction payments (RORP). They continued making these payments until July 1, 1983, when Union Carbide and Petrosar terminated their contract.

The pricing mechanism for the Union Carbide-Consumers contract insured that Union Carbide was guaranteed to profit on each barrel of oil that Consumers accepted. Using the price Union Carbide paid to Petrosar as a base, Consumers' price was calculated by multiplying the base price by a fixed percentage and adding in certain fixed costs. The net result was that Consumers always paid Union Carbide more per barrel than Union Carbide paid to Petrosar, with the difference between these two prices amounting to a certain net profit.

The second contract involved in this case is Union Carbide's 1974 contract with Petrosar to purchase 27,000 barrels of residual fuel oil per day. Since it had no use for the oil in its own operations, Union Carbide sought to dispose of it through resale contracts or on the spot market. In addition to the Consumers contract, Union Carbide had contracted with Niagara Mohawk Power and Light (Mohawk) for the resale of 5,000 barrels per day. As noted above, Union Carbide terminated its contract with Petrosar on July 1, 1983. Union Carbide's termination of its Petrosar contract was the result of many factors, only one of which was Consumers' refusal to accept further deliveries of residual fuel oil after 1981. As a result of its decision to end this contract, Union Carbide negotiated a settle-

ment of its contractual obligations with Petrosar. The terms of this settlement required Union Carbide to assign the Mohawk contract to Petrosar and pay it approximately $20 million (Canadian).

There is no dispute over the measure of damages to be applied for all shipments of oil which Union Carbide resold. Both parties agree that UCC § 2–706(1) dictates that damages for this oil should be measured by the difference between the resale price and the contract price plus allowable incidental damages minus expenses saved in consequence of the buyer's breach.

The parties disagree over the proper measure of damages to be applied for the oil which Consumers refused that Union Carbide did not attempt to resell. This includes the oil identified to the Consumers' contract which Union Carbide paid RORP to Petrosar to not deliver to it plus the amount of oil that would have been identified to the Consumers' contract if Union Carbide had not terminated its contract with Petrosar. While the parties concur that UCC § 2–708 applies, they differ over which section of that provision should be utilized.

The text of § 2–708 provides that:

2–708. *Seller's Damages for Non-Acceptance or Repudiation.*

(1) Subject to subsection (2) and to the provisions of this Article with respect to proof of market price (Section 2–728), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (Section 2–710), but less expenses saved in consequence of the buyer's breach.

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller

---

1. Hereinafter, all cites are to the official text of the UCC. The Michigan statutes are contained in Mich.Comp. Laws Ann. § 440.1101 *et seq.*

would have made from full performance by the buyer, together with any incidental damages provided in this Article (Section 2–710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

Union Carbide claims that the appropriate measure of damages is governed by section 1 (market price differential). It urges that the court award market price damages. These were estimated at oral argument to amount to approximately $120 million (U.S.).

Consumers responds that section 2 (lost profits) damages are more appropriate in this case because they give Union Carbide what it would have received if the contract had been performed. Consumers believes that market price damages would greatly overcompensate Union Carbide for the riskless role it assumed in this contract. It says this would violate UCC § 1–106. Lost profit damages were estimated at oral argument to amount to $30 million (U.S.).

LEGAL ANALYSIS

Turning first to the language of the statute, the court must interpret the first phrase of § 2–708(2), which says: "If the measure of damages provided in subsection (1) is *inadequate* to put the seller in as good a position as performance would ..." The key to understanding this passage's meaning is the word "inadequate."

Union Carbide claims that the language of the statute supports reading inadequate to mean insufficient. Thus, whenever market price damages undercompensate the seller (relative to contract performance), the seller can, under Union Carbide's interpretation, elect lost profits damages. This reading of the statute ignores the question of what measure of damages is appropriate where market price damages greatly overcompensate the seller vis-a-vis what it would receive if the contract had been performed. Presumably, Union Carbide would claim the seller somehow deserved this exorbitant award as the premium for standing ready to perform in the face of the buyer's breach.

This position is contrary to the clear intention of the UCC that remedies should place the parties in the same position as if the contract had been performed. UCC § 1–106, for example, provides that the remedies of the UCC should be "... liberally administered to the end that the aggrieved party may be put in as good a position as if the other had performed ..." and that neither penal, special, nor consequential damages be awarded except where specifically provided by law. This court is reluctant to endorse any position that runs counter to this policy.

■ Instead, the court believes that inadequate should be interpreted to mean incapable or inadequate to accomplish the stated purpose of the UCC remedies of compensating the aggrieved person but not overcompensating that person or specially punishing the other person. The measure of damages provided in section 1 will be incapable of putting the seller in as good a position as performance whenever it does not fairly measure the damages suffered by the aggrieved party. This interpretation is more flexible in that it provides the damages under section 1 can be too great or too small.

■ Moreover, the language of 2–708(2) states the seller should be put in "as good as" a position as performance would have done. "As good as" does not include better than. The statute should not authorize awards of damages which put the seller in a better position than performance would have put them. This view is supported by the policy behind UCC § 1–106, discussed above.

■ Existing case law supports the court's reading of the statute. There is no Michigan case law which addresses this issue. However, since the UCC is intended to be interpreted uniformly across the country, it is appropriate to look to the decisions of other courts in other states for guidance. The Fifth Circuit has examined a factual situation very similar to this one and held that UCC § 2–708(2) applies when the buyer can prove that damages under 2–708(1) would overcompensate the seller.

*Nobs Chemical, USA, Inc. v. Koppers Co., Inc.*, 616 F.2d 212 (5th Cir.1980).

*Nobs Chemical* involved a suit by the disappointed sellers of 1000 metric tons of cumene (a colorless oily hydrocarbon used as an additive for high-octane gasoline) against the breaching buyer. The sellers had not yet actually purchased, or contracted in a binding fashion to purchase, the cumene. They had contacted their manufacturer in Brazil and arranged to get the cumene with another shipment of 3000 tons that they had ordered for some clients.

In district court, the seller requested market price damages under 2–708(1). The buyer objected that these damages would overcompensate the seller and asked the court to award lost profits. The district court awarded lost profits and the Court of Appeals affirmed.

The Court of Appeals relied on White and Summers treatise on the UCC. J. White and R. Summers, Uniform Commercial Code (1st Ed. 1972). The court examined White and Summers' analysis of section 2–708, saying:

Professors White and Summers, recognizing that § 2–708(b) [§ 2–708(2)] is not the most lucid or best-drafted of the sales article sections, decided that the drafters of the Uniform Commercial Code intended subsection (b) to apply to certain sellers whose losses would rarely be compensated by the subsection (a) [§ 2–708(1)] market price-contract price measure of damages, and for these sellers the lost profit formula was added in subsection (b). One such type of seller is a "jobber," who, according to the treatise writers, must satisfy two conditions: "[f]irst, he is a seller who never acquires the contract goods. Second, his decision not to acquire those goods after learning of the breach was not commercially unreasonable...."

\* \* \* \* \* \*

The plaintiffs argue, however, that in this case the measure of damages under subsection (a) would adequately compensate them and therefore, according to the terms of subsection (a), subsection (b) does not control. This is an intriguing argument. It appears that the drafters of § 2708(a) did not consider the possibility that recovery under that section may be more than adequate. White & Summers, *supra*, § 7–12, at 232–233. It is possible that the code drafters intended subsection (a) as a liquidated damage clause available to a plaintiff-seller regardless of his actual damages. There have been some commentators who agree with this philosophy.... But, this construction is inconsistent with the code's basic philosophy, announced in Tex.Bus. & Com.Code Ann. § 1.106(a) (Vernon), [UCC 1–106(1)] which provides "that the aggrieved party may be put in as good a position as if the other party had fully performed" but not in a better posture. White & Summers, *supra*, § 7–12, at 232.

\* \* \* \* \* \*

Moreover, White and Summers conclude that statutory damage formulas do not significantly affect the practices of businessmen and therefore "breach deterrence," which would be the purpose of the statutory liquidated damages clause, should be rejected in favor of a standard approximating actual economic loss. White & Summers, *supra*, § 7–12, at 232. No one insists, and we do not think they could, that the difference between the fallen market price and contract price is necessary to compensate the plaintiffs for the breach. Had the transaction been completed, their "benefit of the bargain" would not have been affected by the fall in market price, and they would not have experienced the windfall they otherwise would receive if the market price-contract price rule contained in § 2–708(a) is followed. Thus, the premise contained in § 1.106 is a strong factor weighing against application of § 2.708(a).[3]

---

[3] White and Summers condition forcing the damage formula of subsection (b) on the plaintiff-seller. They would require the defendant to prove that the measure of damages in subsection (a) would overcompensate the plaintiff. We do not find this to be a problem here, as the figures themselves refute any contention that

the market price-contract rule is anything but over-adequate compensation for the plaintiffs. White & Summers, *supra,* § 7–12, at 232–233.

*Id.* at 215–216. (citations to the official text of the UCC added).

The figures referred to in footnote 3 showed that lost profits damages amounted to $95,000 (U.S.), while market price damages would have come to approximately $300,000 (U.S.).

Union Carbide can be described as a middleman or jobber in this case, at least for the period in which it did not accept the residual fuel oil which it had contracted to sell to Consumers. As the middleman between Petrosar and Consumers, Union Carbide's role was simply to get the oil, transport it to Consumers and receive its guaranteed profit. Once it stopped reselling the oil identified to the Consumers' contract, Union Carbide's decision not to acquire further quantities of oil from Petrosar was a commercial reasonable one. Thus, for the period of time in which Union Carbide claims it should be awarded market price damages, it was a middleman.

█ This court agrees with the *Nobs Chemical* court that allowing section 1 damages where they overcompensate the plaintiff is equivalent to awarding liquidated damages to Union Carbide. This would be inconsistent with the code's basic philosophy as expressed in UCC § 1–106(1). Neither does this court believe that breach deterrence justifies granting such a disproportionate award.

Most importantly, this court finds that here, as in *Nobs Chemical,* had the transaction between Union Carbide and Consumers been completed, Union Carbide's "benefit of the bargain" would not have been affected by changes in the market price of oil. The price formula which set the contract price paid by Consumers tracked the price that Union Carbide paid to Petrosar. No matter what happened to Petrosar's prices, Union Carbide could pass through the change in prices to Consumers. It was

guaranteed its fixed profit on the contract and no more. Any windfall gains that might arise from rapid price changes would be realized by Petrosar, not Union Carbide. For this court to fundamentally alter this allocation of contractual benefits between the parties by giving Union Carbide vastly greater returns than were provided for by its contract with Consumers would fly in the face of the UCC's basic premises and be manifestly unjust. In short, Union Carbide was guaranteed a riskless, fixed profit under the terms of the contract and they should not receive the benefit of price fluctuations whose risk they did not assume.

Finally, the court finds that market price damages will overcompensate Union Carbide. By overcompensation, the court means that Union Carbide would receive greatly more than the riskless benefit of the bargain they would have received if the contract had been performed.[2] At oral argument, the court heard uncontested evidence that Union Carbide would have earned approximately $30 million (U.S.) if the contract had been performed. These were its lost profits. Its damages under the market price measure of damages would be four times as great, or roughly $120 million (U.S.).[3] This is sufficient to establish overcompensation.

Union Carbide relies on the Second Circuit's decision in *Trans World Metals, Inc. v. Southwire Company,* 769 F.2d 902 (2d Cir.1985), to support its argument that it should be able to elect market price damages if it prefers them. This court finds that *Trans World* is distinguishable.

In that case, Southwire, the buyer, repudiated a short-term supply contract for the provision of aluminum that it had entered into with Trans World, the seller. The contract ran from January to December, 1982. It was negotiated in April of 1981. Between that time and March 1982, the price of aluminum dropped dramatically. Southwire repudiated the entire contract in March 1982, alleging that the supplies for

---

**2.** The court does not imply that this same standard of overcompensation would apply if Union Carbide bore the risks of price fluctuations.

**3.** In *Nobs Chemical,* the Fifth Circuit found that market price damages three times greater than lost profits were overcompensation. 616 F.2d at 216, n. 3.

February had been delivered late in violation of a "time-is-of-the-essence" clause. The jury held for Trans World in special interrogatories finding that the "time-is-of-the-essence" clause was not part of the contract and therefore the repudiation was a total breach. The court of appeals held that the jury's findings were supported by the evidence. They then reviewed the alleged errors of the district court.

The court considered the defendant's argument that the award of contract price damages overcompensated the plaintiff-seller. It held that market price damages should be awarded. *Id.* at 907.

The court was unconvinced that Trans World would be overcompensated by the award of damages under 2–708(1). They believed that the parties had consciously assumed different risks of price variations: Southwire assumed the risk that prices would fall and Trans World assumed the risk that the price would rise. It would deny Trans World the benefit of its bargain if they were not allowed to gain from the drop in prices.

The *Trans World* court distinguished the *Nobs Chemical* decision. They said the seller in *Nobs Chemical* was a middleman who had fixed its supply price prior to entering into the contract with the buyer Koppers Company. The seller had therefore protected itself against the risk of market price fluctuations and it would have been unfair to allow them to reap a riskless benefit. This was not the case in *Trans World* because the parties had expressly bargained for the allocation of the risk of price changes.

Similarly in this case, the focus of the decision must center on the fundamental allocation of risk between the parties. The price mechanism in the contract insured that Union Carbide could pass through all of its costs to Consumers. This means Union Carbide, the middleman, assumed no risk of price changes. *Trans World* is therefore inapplicable; *Nobs Chemical* should be applied instead.

■ One other matter should be resolved. Under UCC § 2–708(2), Union Carbide is entitled to incidental damages.

Counsel for Consumers represented at oral argument that the RORP payments which Union Carbide made to Petrosar would fall within the rubric of incidental damages. Consumers' counsel further stated that Union Carbide's payments to Petrosar in settlement of its contractual obligations with them would be incidental damages at least to the extend they can be apportioned to the loss of the Consumers' contract. The court finds that UCC § 2–710 defining a seller's incidental damages can be reasonably interpreted to cover these costs. They are commercially reasonable expenses incurred by the seller as a result of the buyer's breach.

In summary, the limited applicability of this decision should be reemphasized. The seller in this case was a middleman who assumed none of the risks of price variations. The contract provided that the seller would be guaranteed a profit on all goods accepted by the buyer. Moreover, the buyer proved that market price damages would overcompensate the seller. Given these limiting facts, the court holds that the seller's damages should be calculated under § 2–708(2).

SO ORDERED.