833 F.2d 418
 ELECTRONIC SWITCHING INDUSTRIES, INC., Plaintiff-Appellant,
Cross-Appellee,
v.
FARADYNE ELECTRONICS CORP., Mansol Ceramics Corp., Gayshen
Corporation and Total Tel USA a division of
Gayshen Corporation, Defendants-Appellees.
Gayshen Corporation, Defendant-Appellee-Cross-Appellant.
 Nos. 703, 874, Docket Nos. 86-7828, 86-7850.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 27, 1987.
Decided Nov. 13, 1987.
 
 Susan Pernick, Jericho, N.Y. (Semon & Mondshein, Jericho, N.Y.), for plaintiff-appellant-cross-appellee.
 Jeffrey Daichman, New York City (Grutman Miller Greenspoon & Hendler, New York City, Joseph Santora, of counsel), for defendants-appellees and defendant-appellee-cross-appellant.
 Before OAKES, MESKILL and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 This litigation is based upon two contracts dated October 14, 1982 between plaintiff, a New York corporation, and defendant Gayshen Corporation ("Gayshen"). One contract (the "Purchase Contract"), supplemented by purchase orders dated February 7, 1983 and March 21, 1983 on the letterhead of defendant Mansol Ceramics Company ("Mansol"),[1] was for the purchase by Gayshen from plaintiff of a "least cost" telephone routing system for telephone resale application, known as the "ESI 6020." The other contract (the "Service Contract") called for the provision of management, billing, reporting and maintenance services by plaintiff to Gayshen. Plaintiff sought recovery of the $40,676.83 balance due on the Purchase Contract from all defendants. Defendants in turn claimed that plaintiff had breached the Purchase Contract, and defendants accordingly were not liable for that balance. The United States District Court for the Eastern District of New York (Leonard D. Wexler, Judge ) found for plaintiff on this claim against Gayshen, and dismissed as to the other defendants. Plaintiff also sought recovery from all defendants of eight percent of defendant's receivables, as provided in the Service Contract, in the amount of $6,000 for collections to and including June 30, 1983, and for anticipated receivables to December 31, 1984. The district court awarded $6,000.00 against Gayshen, but denied any further recovery because the claimed damages were deemed too speculative in view of the default of plaintiff combined with the lack of proof as to specific damages. The claims under the Service Contract were dismissed as to all other defendants, and all counterclaims were dismissed.
 
 Background
 
 2
 The function of the ESI 6020 "least cost" telephone routing system, also known as a telephone switching system, is to select via pre-programmed information the least expensive among the various long distance companies, such as MCI and Sprint, for the completion of a long distance telephone call placed by a business entity, such as Gayshen, which avails itself of the ESI 6020. Gayshen entered into the Purchase and Service Contracts in connection with its commencement of a new business as a "resale common carrier" vending telephone services to customers on a retail basis.
 
 
 3
 Gayshen began using the ESI 6020 in January, 1983, after its installation, and continued using it until May 24, 1983, when Gayshen disconnected the ESI 6020 and replaced it with another switching device manufactured by Digital Switch Corporation. Gayshen's justification for this action, in terms of the Purchase Contract, was that plaintiff had failed to provide a switch with an automatic redundancy feature (a device which facilitates switching to a backup system in the event of the primary system's failure), as purportedly agreed by the parties. As to the Service Contract, Gayshen contended, and the district court agreed, that plaintiff had failed to comply with the requirements for traffic engineering recommendations expressed in the following paragraphs of that agreement:
 
 
 4
 TRAFFIC ENGINEERING The Company [plaintiff] will from time to time, at no additional cost to the Operator [Gayshen], analyze the Operator's traffic data and traffic printouts and make recommendations for changes in routing or alternate routing patterns as well as changes in trunk quantities. Upon request by the Operator the Company will develop and install the required program changes into the Operator's system at no additional cost to the Operator.
 
 
 5
 TELCO COORDINATION The Company will assist the Operator in ordering new equipment or services or changing existing equipment or services from the telephone company, other common carriers, or other suppliers to change the routing system configuration at no additional cost to the Operator.
 
 
 6
 Further factual matters will be set forth as they become relevant to the ensuing legal discussion.
 
 Discussion
 A. The Purchase Contract
 
 7
 The district court resolved this issue in plaintiff's favor on the basis that the Purchase Contract was unambiguous on its face, did not refer to an automatic redundancy feature, and could not be altered by parol evidence. The district court also found that: "[d]uring 1982 and the beginning of 1983, plaintiff was working on a redundancy feature which plaintiff agreed to install when completed;" "[a]ll routing switches used in the telephone resale industry have an automatic redundancy feature;" Gayshen "orally asked for a redundancy feature and plaintiff orally promised to provide such a feature;" and plaintiff had not perfected the feature as of May 24, 1983, when Gayshen replaced the ESI 6020. The uncontested evidence at trial was that defendant asked, on several occasions after the contract was in effect, when the automatic redundancy feature would be ready, and was told "in a week or two."
 
 
 8
 The record reveals that the district court was troubled by Gayshen's failure to insist on including in the contract a specific reference to the automatic redundancy feature, given Gayshen's knowledge prior to signing the contract that plaintiff did not have the feature completed. During redirect examination of Gayshen's executive vice president James A. Foster, the following colloquy occurred between the court and Foster:
 
 
 9
 THE COURT: But this is the part that puzzles me.
 
 
 10
 You entered into a long contract; you entered into a contract of something new. There was a contract depending upon one individual's ability. At the time you knew that he did not have the switching-switch, redundancy switch, whatever you want to call it, ready and available.
 
 
 11
 He kept giving you dates, according to you, and kept adjourning it. Nothing is in the contract about it; nothing is in the writing about it?
 
 
 12
 THE WITNESS: Sir,--or your Honor--
 
 
 13
 THE COURT: Why is it in isn't it in the contract?
 
 
 14
 THE WITNESS: I'm not a lawyer, first of all. I'm in the industry--
 
 
 15
 THE COURT: I'm a lawyer and I have to look for it in the record and I don't see it. The only thing I can find is your little mark indicating that's where a switch would be on the diagram. I'm sure that was looked over by engineers, by lawyers and everybody else?
 
 
 16
 THE WITNESS: They were relying on my expertise in the business and with my expertise and my knowledge of the business there are certain assumptions when it talked about a dual control system and it talked about state of the art throughout the system--
 
 
 17
 THE COURT: There's only one reference to that.
 
 
 18
 THE WITNESS: State of the art.
 
 THE COURT: Yes.[2]
 
 19
 THE WITNESS: But automatic and the dual control system in the RCC Industry, I know of no manual switching machine.
 
 
 20
 THE COURT: But you knew it wasn't ready at the time?
 
 
 21
 THE WITNESS: Yes, I did.
 
 
 22
 J.App. 295-96.
 
 
 23
 Moreover, the district court was concerned that Gayshen's defense based upon the absence of the automatic redundancy feature was a recent fabrication. James Foster testified at trial (on direct examination) that Gayshen's purchase of the Digital machine did not result from Gayshen's need to expand its system and that Gayshen would have stayed with plaintiff had plaintiff provided the automatic redundancy switch. Foster was then presented on cross-examination with a portion of his deposition testimony in which he testified that he started looking for new equipment because "the existing equipment was to capacity" and "[t]he number of customers were growing at a rate that I projected we would have outgrown...." There was no mention in the deposition testimony of the automatic redundancy feature. After the discrepancy was brought out, the following exchange occurred between the trial judge and Foster:
 
 
 24
 THE COURT: Mr. Foster, when you were asked what was the basis for your switching over, why didn't you say something about the switch, the automatic switch? Why did you rely upon the lead time, the short lead time, rather than the switch?
 
 
 25
 THE WITNESS: I'm afraid I really can't answer that at this point. There were so many things that I was dissatisfied with, I was absolutely paranoid with losing the customer base in this intense industry.
 
 
 26
 THE COURT: But this deposition was taken May 9, 1984. You worry about losing customers, were all gone. It was out of the way?
 
 
 27
 THE WITNESS: No, it wasn't.....
 
 
 28
 THE COURT: No, I'm asking you in your deposition--and you were under oath, why didn't you say it?
 
 
 29
 THE WITNESS: Why did I not say the switchover?THE COURT: Yes. You referred to the short time and other things. You forgot? ?
 
 
 30
 THE WITNESS: I'm afraid I can't really give an answer as to why I didn't.
 
 
 31
 THE COURT: As a Judge, I have to figure out these things. If someone doesn't say it under oath and now says it on the stand when he had an opportunity and that was the major objection to the whole thing, that's what everybody has been telling me because it wasn't the switchover, that was the major objection.
 
 
 32
 Now you are telling me it was the 120 days,[3] short time, whatever you call it. That was the major thing; it wasn't the switch.
 
 
 33
 If fact you even forgot about the switch on the deposition.
 
 
 34
 Q. And--
 
 
 35
 MS. PERNICK: May I proceed?
 
 
 36
 THE COURT: Let him answer.
 
 
 37
 MS. PERNICK: I'm sorry.
 
 
 38
 THE WITNESS: I'm afraid I can't answer that, sir.
 
 
 39
 THE COURT: Okay.
 
 
 40
 J.App. 264-266.
 
 
 41
 Although it has not been cited to us by the parties, we note the possible applicability to this issue of N.Y.U.C.C.Law Sec. 2-202 (McKinney 1964), which provides in part:
 
 
 42
 Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
 
 
 43
 (a) by course of dealing or usage of trade....
 
 
 44
 The district court was presumably relying, at least in part, upon that portion of this statute which precludes contradiction of written terms "by evidence of ... a contemporaneous oral agreement" in ruling that "[t]he law of the State of New York is that parol evidence is not admissible to vary the terms of an agreement that is complete and unambiguous on its face." Specifically, the court found that there was an oral agreement to provide the automatic redundancy feature, but gave no effect to the oral agreement in its determination of the terms of the Purchase Contract.
 
 
 45
 On the other hand, in view of the district court's finding that "[a]ll routing switches used in the telephone industry have an automatic redundancy feature," the argument could be made that the terms of the Purchase Contract, in the words of the statute, "may be explained or supplemented" by this "usage of trade." See Trans World Metals, Inc. v. Southwire Co., 769 F.2d 902, 906 (2d Cir.1985), and authorities there cited.[4]
 
 
 46
 Although this aspect of the case is somewhat troubling, on balance we do not find a basis for reversal. The statute only provides that written terms "may" be explained or supplemented by usage of trade. In light of the silence of the written contract on this subject, Gayshen's failure to specify the lack of an automatic redundancy feature as a basis for termination either contemporaneously or almost a year later when depositions were conducted, and its further failure to go beyond inquiries concerning the availability of that feature and put plaintiff on notice that its provision was essential to a continuation of their relationship, we find no error in the district court's determination that Gayshen was liable for the balance due on the Purchase Contract.
 
 B. The Service Contract
 
 47
 As stated earlier, the district court determined that plaintiff failed to provide required traffic engineering recommendations, and that plaintiff's claimed damages under the Service Contract were "too speculative in view of the default by plaintiff combined with the lack of proof as to specific damages," except that plaintiff was allowed to recover $6,000.00 plus interest representing agreed compensation on collections to and including June 30, 1983. Plaintiff claims here that Gayshen failed to prove plaintiff's supposed prior breach of the traffic engineering clause. In fact, however, there was ample evidence supporting the district court's findings on this issue.
 
 
 48
 Mr. Foster testified that he never received any traffic engineering recommendations from plaintiff. Plaintiff's witness, Michael Paulini, conceded that plaintiff never submitted written traffic engineering reports or recommendations to defendant. Plaintiff's expert, Douglas Kenney, stated that he could not find any written traffic routing recommendations in plaintiff's files.
 
 
 49
 Plaintiff points to Exhibit 15 as proof that proper traffic engineering was performed. Exhibit 15 is a printout of five months of calls processed by the switching equipment, including information on hour-by-hour breakdowns of telephone calls and trunk line transmissions. Mr. Kenney testified that Exhibit 15 demonstrated the ability of plaintiff's president, Max Paulini,[5] to maintain a smooth, efficient, economical traffic per trunk flow from January to early May of 1983.
 
 
 50
 Exhibit 15, however, is not a traffic engineering recommendation or report; rather, it is simply a compilation of raw data from which Kenney drew certain inferences concerning Max Paulini's overall management of the switching system. Moreover, it was Kenney's testimony that most convincingly showed plaintiff's inability to keep up with defendant's rapid expansion. Kenney testified that by May, 1983, it would have been prudent on Max Paulini's part to have added an automatic redundancy switch to the ESI 6020, given defendant's rapid attraction of new customers. Kenney further opined that plaintiff should have added new trunk lines in May, 1983 because of the increased traffic on the system, and that he "had no way of knowing, you know, why that wasn't done."
 
 
 51
 Thus, whether one views traffic engineering as making reports and recommendations on efficient use of the ESI 6020 or expands the definition to include keeping the ESI 6020 efficient for the present and future, there was ample testimony supporting the trial court's ruling as to plaintiff's breach. Plaintiff's argument that defendant showed no injury resulting from any breach misses the point of Kenney's testimony and the court's findings. Judge Wexler concluded that plaintiff was unable to handle the rapid expansion called for by defendant's growing customer base, in part because of faulty traffic engineering, specifically finding that: "By 6/30/83, defendant Gayshen Corp. would have outgrown the facilities covered by the contract and provided by plaintiff in the ESI 6020 equipment. Defendant Gayshen Corp. had a legal right to anticipate recommendations and suggestions on routing patterns."
 
 
 52
 The cases urged upon us by plaintiff do not call for a different result. In Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 926-27 (2d Cir.1977), for example, there was error in the district court's refusal to admit statistical evidence tending to prove the amount of lost record sales due to defendant's failure to promote a recording. In contrast, the lower court here admitted the statistical evidence for what it was worth, and found as a matter of fact that the damages were speculative. In doing so, it applied the proper standard by admitting the evidence. Judge Wexler had the opportunity to evaluate the credibility of the expert witness who performed the projection. Furthermore, the district court's limitation of the damages awarded to plaintiff with respect to the Service Contract was not based exclusively upon the lack of specificity in plaintiff's proof, but also upon the district court's proper conclusion that plaintiff had itself breached the Service Contract by failing to provide traffic engineering recommendations.
 
 
 53
 Defendant Gayshen contests the court's award of $6,000 in damages to plaintiff in light of the court's finding that plaintiff breached the management and billing contract. This argument does not take into account the court's finding that plaintiff would have been able to maintain the system through June 30, 1983. Based upon the record developed at trial, we cannot say that the court's finding was clearly erroneous. Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); Fed.R.Civ.P. 52(a).
 
 C. Dismissal of Other Defendants
 
 54
 Plaintiff also complains of the district court's dismissal of plaintiff's claims against defendants Faradyne, Mansol, and Total Tel. Although the Purchase Contract and Service Contract were each executed by Gayshen, plaintiff points out that both purchase orders for expansion of the Purchase Contract were on the letterhead of Mansol and were signed by a Mansol purchasing agent, and that Mr. Foster sent a letter on the letterhead of Total Tel enclosing a check drawn on Mansol's account to the order of plaintiff as a payment with respect to the Service Contract.[6]
 
 
 55
 Even assuming, however, that plaintiff showed complete control and domination of Gayshen by Faradyne, Mansol, and Total Tel, so that Gayshen had no separate mind, will, or existence of its own, plaintiff failed to allege or prove that this control and domination was used to commit wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights, and that the control and breach of duty proximately caused the injury complained of. Absent such a showing, New York law will not allow a piercing of the corporate veil. Gorrill v. Icelandair/Flugleidir, 761 F.2d 847, 853 (2d Cir.1985); see also Williams v. McAllister Brothers Inc., 534 F.2d 19, 21 (2d Cir.1976).
 
 Conclusion
 
 56
 The judgment of the district court is affirmed. The parties shall bear their own costs.
 
 
 
 [1]
 Mansol is the parent of Gayshen, and defendant Faradyne Electronics Corp. ("Faradyne") is the parent of Mansol. All are New Jersey corporations. The district court found that defendant Total Tel USA ("Total Tel") is a division of Mansol, although the agreed caption of the case describes Total Tel as a division of Gayshen. The district court determined that this diversity case is governed by New York law. The Purchase Contract explicitly so provides, the district court's conclusion is not challenged on appeal by any of the parties, and in any event we concur in that conclusion
 
 
 [2]
 The district court specifically found that "[t]he reference to the state of the art in the contract is to the least cost routing, not to the redundancy feature."
 
 
 [3]
 Under the terms of the Purchase Contract, any Gayshen orders for additional routing systems had to be filled and the systems installed within 120 days
 
 
 [4]
 Defendants' main brief on appeal cited Trans World and other cases on this point, but did not cite Section 2-202
 
 
 [5]
 Max Paulini died on November 2, 1983
 
 
 [6]
 We are given pause only by the execution of the purchase orders, as to which judgment for a balance due of $7,088.34 (plus interest) was entered, on Mansol letterhead. The district court found, however, that Gayshen ordered expansions of the ESI 6020 system by these purchase orders, and we cannot conclude that this finding is clearly erroneous