ORIENTAL COMMERCIAL AND SHIP-PING CO., LTD., Oriental Commercial and Shipping Co. (U.K.), and Abdul Hamed Bokhari, Plaintiffs,

v.

ROSSEEL, N.V., Defendant.

Nos. 84 CIV. 7173 (PKL), 84 CIV. 7689 (PKL).

United States District Court, S.D. New York.

Dec. 19, 1988.

McLaughlin & Stern, Ballen and Ballen, New York City (S. David Harrison, of counsel), for plaintiffs.

Baker & McKenzie, New York City (Arthur W. Rovine, and Grant Hanessian, of counsel), for defendant.

## OPINION AND ORDER

LEISURE, District Judge:

In this action, defendant Rosseel, N.V. (hereinafter "Rosseel") seeks to compel plaintiffs to arbitrate, pursuant to Article II(3) of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards [1] (hereinafter "the Convention"), under a contract for the sale of high sulfur fuel oil.

On August 14, 1984, Rosseel served a notice of its intention to arbitrate upon plaintiffs Oriental Commercial and Shipping Co. (U.K.) Ltd. (hereinafter "Oriental U.K.") and Oriental Commercial and Shipping Co., Ltd. (hereinafter "Oriental Saudi Arabia" or "Oriental S.A."). Although Oriental U.K. did not challenge said notice of arbitration, Oriental S.A. responded by filing an action to stay arbitration in the Supreme Court, New York County. Defendant Rosseel removed the state court proceeding to this Court on October 4, 1984. In a separate action, Rosseel then moved in this Court, pursuant to Article II(3) of the Convention, to compel arbitration and for the appointment of an arbitrator. The two actions were consolidated by stipulation of the parties.

On March 4, 1985, this Court ruled that it had jurisdiction under the Convention, that the arbitration clause in the contract was valid, and that this dispute is governed by the arbitration clause. The Court also found that at that time, there were insufficient facts before the Court to determine whether Oriental S.A. should be made a party to the arbitration proceeding.

On August 27, 1985, Rosseel served plaintiff Abdul Hamed Bokhari ("Bokhari") with an amended notice of intention to arbitrate, and on September 10, 1985, Bokhari was added as a plaintiff-respondent by stipulation of the parties.

From December 14 to December 16, 1987, a bench trial was held to determine whether Oriental S.A. and Bokhari should be made parties to the arbitration.

## FINDINGS OF FACT

### Rosseel, N.V. and Charles Rosseel

Charles Rosseel ("Mr. Rosseel") is managing director of Rosseel, N.V. ("Rosseel"), a Belgian corporation whose primary business is the trading and distribution of oil products in Belgium and surrounding European countries. From 1956 to 1965, Mr. Rosseel was an employee of a Belgian oil trading company, and he created Rosseel in 1965.

Rosseel purchases and trades oil obtained from local Belgian refineries—including refineries owned by major multinational oil corporations—and from refineries in Rotterdam, Germany, and France. Rosseel also imports oil products from oil producing countries in the Middle East and North Africa. In general, the oil product supply is obtained through both long and short term contracts, as well as by purchases on the "spot" market.

Mr. Rosseel possesses a Belgian oil trader's license. He has himself taught preparatory courses for individuals seeking to obtain the oil trader's license. He is also a member of several Belgian oil trade associations, including the Association of Oil Distributors of West Flanders, the Association of Oil Distributors, the National Association of Independent Oil Importers, and Inform Mazoot. Based on his education, experience, teaching, and association memberships, the Court found, without objection from plaintiffs' counsel, that Mr. Rosseel was qualified to testify as an expert with respect to the oil trading and distribu-

1. 9 U.S.C. §§ 201 and 206.

tion industry in Belgium. Despite Mr. Rosseel being a witness with an interest in the outcome of the litigation, the Court found his uncontradicted expert testimony concerning practices in the oil trading market to be wholly credible.

*Practices in the oil trading market*

Trading in the European oil market is arranged primarily by telephone. Successful traders are known in the market, and tend to work with a set of people with whom long term trading relationships have developed. Normally, numerous offers are made to traders in a given day. When a trader receives an offer, the trader will normally inquire as to the quantity of oil or oil product available, the quality of the product, the timing of delivery, and the payment conditions.

Offers are generally communicated to traders, however, through two different means. At times, the principal whose oil product will be sold will make the offer itself. When the principal makes the offer, the trader will know with whom he is dealing. The trader will normally know both the reputation of the entity and of the individual representing the entity. Very often, however, it is not the principal itself, but a broker, who communicates the offer. When the deal is proposed by a broker, the trader will normally not know the principal seller until agreement is reached to pursue the trade. The broker will not reveal the principal seller to prevent the purchaser from going directly to the principal and excluding the broker from the deal. On average, about one half of all trades are consummated through brokers, although that percentage decreases during periods when a shortage of particular products exists, and conversely increases when a overflow of particular products exists in the market.

In transactions involving brokers, the pre-existing relationship between the purchaser and the broker is especially significant. The purchaser must rely on the information provided by the broker, and must rely on the broker's assurances that the principal will in fact provide the quantity and quality of product on the terms

agreed upon. Given the reliance parties in the industry must have on each other, the different parties seek to protect themselves and their knowledge of the players in the market. As a result, the number of players in the market tends to stay relatively small.

Whether transactions be initiated through a broker or directly with the principal, oil trading purchases are usually consummated at a fast pace, and in oral telephone communications. It is normally not the practice in such an environment for the purchaser to seek to verify the financial status of the principal company, even when that principal is known. It is also not a part of industry practice for a purchaser to request that a broker provide specific financial information concerning the principal.

When a contract is formally executed, and the broker reveals the identity of the principal seller, it may become apparent that the principal is a subsidiary or branch of some other entity. Mr. Rosseel credibly testified that such information normally is of little relevance because the general practice in the industry is that "if you make a contract with a certain subsidiary of a group or of a company, everyone considers the group, the whole—let's say the whole group. I can't find another word, being behind the deal." Tr. 42. Part of the reason for the insignificance attached to the particular corporate name on the contract is that players in the industry know that some groups of companies have certain products available, but for internal reasons—such as tax, organization, or distribution—"the confirmation of a deal is done by another office than the one that negotiated the deal. It is done so often that no oil trader is surprised to see a confirmation coming in on another name . . . than the name of the office he has been dealing with." Tr. 50.

*Oriental S.A. and Oriental U.K.*

Abdul Hamed Bokhari established the Oriental Commercial Establishment in 1956. The main office of Oriental Commercial Establishment was located in Jeddah,

Saudi Arabia, and a London office was opened in July 1982.

In July 1983, Oriental Commercial Establishment ceased operation. That month, Oriental S.A. was incorporated in Saudi Arabia. The main office of Oriental S.A. is located in Jeddah. Among other businesses, Oriental S.A. supplies bunkers to vessels, and provides agency services to vessels calling in Saudi Arabian ports. Bokhari is president of Oriental S.A. Shamin Ashraf is Vice President and General Manager of Oriental S.A. The 1500 shares of the company are privately held, with 735 shares held by Bokhari, and the remaining shares held by members of his family. Bokhari and his wife, Zainab A.R. Bokhari, are directors of Oriental S.A. Both are citizens of Saudi Arabia.

Oriental U.K. was incorporated according to the laws of England and Wales in September 1983. Its offices are located in England. Bokhari is Chairman and Managing Director of Oriental U.K. The 100 shares of Oriental U.K. are privately held. Bokhari holds 70 shares and his wife holds 30 shares, both are directors of Oriental U.K.

David H. Clements ("Clements") is Secretary of Oriental U.K., a position that he has held since late 1983. Prior to his employment at Oriental U.K., Clements was employed as a bunker broker by the British company Celtic Chartering. In that capacity, he acted as an agent for Bokhari and for Oriental S.A. Bokhari hired Clements to represent his interests directly at Oriental U.K.

At Oriental U.K., Clements had substantial responsibility in the period from September 1983 to September 1985. Though Bokhari and Clements were each signatories on Oriental U.K.'s bank accounts, Clements had authority to sign checks without notifying Bokhari or anyone else affiliated with Oriental S.A. Mrs. Clements, Clements' wife, worked as Oriental U.K.'s bookkeeper, and prepared account statements which were not reviewed by Oriental S.A. During 1984, Bokhari actually visited the Wembly office of Oriental U.K. only two or three times, and during these short visits, he normally would only make phone calls or use the telex machine. Like other entities affiliated with Bokhari, Oriental U.K. was able to function with relative day to day independence. Tr. 301. Even among agents fully owned by Bokhari, there were never conferences or meetings to discuss global or "group" policy or strategy.

Nonetheless, Clements felt answerable to Bokhari and viewed him as the active chairman of Oriental U.K. Tr. 303. Indeed, Clements viewed Bokhari as his "boss." Tr. 316. Bokhari and his wife received copies of all reports prepared by Grant Thornton, Oriental U.K.'s auditors.

Moreover, when Oriental U.K. began operations, Bokhari provided $100,000 to pay salaries and to cover administrative and operating expenses. Until March 31, 1984, the office of Oriental U.K. was located in a building owned by Bokhari, and Oriental U.K. paid no rent. During the period from April 1984 to September 1985, Bokhari made further payments to Oriental U.K. in the total amount of $86,000. No written contract exists evidencing obligation of repayment, and no repayment has ever been made. Clements understood at the time that any shortfall in ability to meet payroll or other financial obligations would be covered by Bokhari.

Oriental U.K. maintained three accounts—a dollar call account, a dollar current account, and a pounds sterling account at Williams and Glyns Bank PLC, in London. With the exception, perhaps, of some office furniture, Oriental U.K. had no assets other than the aforesaid accounts, as of March 1984.

During the relevant period of 1983 to 1985, the main focus of Oriental U.K.'s business was the solicitation of business for Oriental S.A. When Oriental S.A. could not participate in a particular trade, or could not provide a competitive product or price, Oriental U.K. would work with another supplier. However, in the period ending March 31, 1984, about 40% of Oriental U.K.'s gross profits were generated from work done exclusively for Oriental S.A.—more than for any other entity. And

from April 1, 1984 to March 31, 1985, about 65% of Oriental U.K.'s gross profits were generated by business activities with Oriental S.A. Oriental U.K. did not hold an annual meeting within eighteen months of incorporation. No financial statements were prepared until October 1985, when its auditors, Grant Thorton, prepared a financial statement for the period ending March 31, 1984.

In late 1983, Clements became aware that an oil trader he knew, Stuart Rudd ("Rudd"), was available to become an employee of Oriental U.K. Clements introduced Rudd to Bokhari believing at that time that Bokhari agreed to Rudd's being employed and had assented to the salary agreed upon by Rudd and Clements.

Rudd became affiliated with Oriental U.K. in January 1984, as a cargo trading manager. After he was hired, however, Clements learned that Bokhari in fact was not pleased that Rudd had been hired, and that Bokhari was concerned about Oriental U.K.'s developing an involvement in cargo trading. Clements volunteered to dismiss Rudd, but Bokhari ultimately assented to Rudd's continued employment.

From January 1984 through September 1985, Clements, his wife, Rudd and a secretary were the only employees of Oriental U.K.

*The Oriental/Rosseel Transaction*

Sometime in January 1984, Rudd, in his capacity as a cargo trading manager at Oriental U.K., contacted a British Oil trader, Anthony Barnard ("Barnard"), and let him know that Oriental U.K. was interested in arranging the sale of approximately 40,000 metric tons of a high sulfur fuel. Barnard indicated that he believed such a sale could be handled through a broker with whom he worked regularly, Johannes Rietveld ("Rietveld"). Rietveld is an owner and director of Olympic Oil and Trading Company. Rudd agreed, and Barnard informed Rietveld of the product and its

availability. On February 2, 1984, Rudd, at Barnard's suggestion, called Rietveld. Rudd indicated in that conversation that the main office of his company, Oriental U.K., was located in Jeddah, Saudi Arabia.

After talking to Rudd, Rietveld contacted another broker, Tjebbe Ree ("Ree"), whom he believed might have a purchaser for the fuel. Ree was, and continues to be, an independent oil broker.[2] After hearing from Rietveld, Ree contacted Mr. Rosseel, for whom Ree had brokered transactions for several years. Ree indicated that he had available a kind of high sulfur fuel oil. Mr. Rosseel expressed an interest in the product, and suggested a lifting date in early April of that year. Ree and Mr. Rosseel also discussed the quantity and quality of the product, and other purchase terms. During these initial conversations, Ree, as was customary practice, did not identify the principal seller of the high sulfur oil.

On February 13, 1984, Rietveld indicated to Barnard that he believed he had found a purchaser and thought the deal could work out. Rietveld indicated, however, that he needed to guarantee certain specifications for the product and the terms. Barnard then contacted Rudd, who indicated that the product was fully covered by the Saudi Arabian company with which Oriental U.K. was affiliated. Barnard believed that Rudd, though located in the United Kingdom, was acting on behalf of the Saudi Arabian company. By that date, Barnard had also agreed with Rudd that Barnard would receive a commission of $2 per metric ton if the deal were to be consummated. That same date, February 13, Barnard communicated to Rietveld that Rietveld could inform the principal buyer that the deal was backed by the main company's office in Jeddah. On that day, Rudd himself also told Rietveld that he was working for a company that included the Saudi entity Oriental Commercial, and that the company

**2.** Ree has a financial interest in the outcome of this litigation. He has not yet received any commission for his brokering of the deal at issue, but will be compensated proportionately out of any award won by Rosseel in arbitration proceedings. Tr. 227. The Court nonetheless found Ree's testimony credible, and found it confirmed by the testimony of Rietveld, who has no financial interest in the outcome of this litigation.

had numerous assets in the Saudi Arabian cities of Yanbu, Rastanura, and Jeddah.

On February 14 or 15, 1984, Rudd and Rietveld had another conversation in which Rudd again assured Rietveld that the deal was a "safe" one because the Saudi company would cover it in every way. Rudd indicated that Abdul Hamed Bokhari was the managing director of the company, and that Bokhari owned the offices in both Saudi Arabia and England. Rudd also indicated that Bokhari had a very influential friendship with one of the vice presidents of Exxon in the United States. By this time, Rudd agreed to pay Rietveld a commission of $4.50 per metric ton of oil sold in the prospective deal.

In conversations with Ree, Rietveld communicated that the company selling the oil would be Oriental Commercial, with a branch office in London, and a main office in Jeddah, Saudi Arabia. Rietveld also communicated that the London office had very little money or other capital. Ree, based on his previous dealings with Rietveld in the brokerage business, was comfortable relying on the representations passed on from Rietveld about the Saudi Arabian parent company and the safety of the deal.

Prior to March 7, 1984, Mr. Rosseel did not learn the principal's identity. On March 7, 1984, however, Mr. Rosseel received a telephone call from Ree in which Ree indicated that a deal had been reached on the terms agreed to by Mr. Rosseel. Ree was to receive a commission from Mr. Rosseel of 25 cents per metric ton. A first confirmation of the deal was sent by Rudd to Mr. Rosseel on March 7. Through an exchange of telexes on that date, Rosseel agreed to purchase, and Oriental U.K. agreed to sell, up to 260,000 barrels, or 46,380 metric tons (plus or minus ten percent) of fuel oil for $126.50 per metric ton. Rosseel ultimately received a price reduction of $1.30 per metric ton, and the total purchase price therefore was $34,341,560. Although Rudd's March 7 telex listed the seller as Oriental U.K., Barnard, Ree, Rietveld, and Mr. Rosseel all understood that the deal was covered by the Saudi Arabian

entity. All four assumed that the listing of the London branch office was wholly consistent with the deal being backed by the head office in Jeddah. Another confirming telex was sent by Mr. Rosseel to Rudd on March 9.

Mr. Rosseel testified that he could not recall the exact date of further discussions with Ree in March 1984, but he testified that:

> ... sometime later on [after the March 7 telex] we have, of course, been speaking further about a deal, and Mr. Ree informed me within the frame of all the negotiations and discussions we had on that deal. But after the conclusion of the contract, that the commercial group was a very important Saudi Arabian group and that that Saudi Arabia Jeddah group was backing—was the word that was often used, "backing" the deal.

Tr. 53.

Between March 11 and March 20, at least three telexes were sent by Rosseel directly to Oriental U.K. Also during that period, Rietveld continued to try to obtain from Rudd an exact date of delivery. During this period, Rudd had convinced Rietveld that the supplier would be Exxon, but Rudd remained unable to confirm a delivery date.

By early April 1984, there had been no resolution of the delays in the planned delivery dates of the high sulfur fuel. The seller also requested permission to make some minor changes in the quality specification of the product. Rietveld and Ree therefore arranged a meeting to be attended by the principals. On April 11, 1984, the meeting took place in Brussels, attended by Mr. Rosseel, Ree, Rietveld, and Rudd.

At the meeting, Rudd again stated that he was affiliated with a Saudi Arabian group, headed by Bokhari. Rudd stressed at the meeting that the Saudi Arabian group would certainly execute the contract. Rudd indicated that Exxon was the direct supplier of the oil, and that there was no need to worry about whether delivery would be made. In fact, Rudd indicated that at the very time the meeting was held, Bokhari was having lunch on the yacht of a

vice president of Exxon to insure the supply of the oil product needed.

Although prior to that date Mr. Rosseel had been told by Ree that a Saudi Arabian "group" was backing the deal, it was at the April 11 meeting that Mr. Rosseel first heard of Oriental, S.A., or of Bokhari. At the April 11 meeting, Rudd gave Mr. Rosseel five items:

1) a brochure from Oriental Commercial and Shipping Co., Ltd., the Saudi Arabian Company, stating on its cover, "You may need us—Keep it in your file" (DX A);

2) an Oriental Commercial and Shipping Co., Ltd. eighteen page color brochure entitled, "Customer's Guide for Clearing, Forwarding and Inland Transport in Saudi Arabia," and bearing the name Oriental Commercial and Shipping Co., Ltd. in English and Arabic (DX B);

3) a book entitled "The Oriental Commercial Establishment" (DX C);

4) a four page color booklet, the cover of which is labelled "The Oriental Commercial Establishment" in English and Arabic (DX D);

5) a book bearing the title "Saudi Arabian Red Sea" (DX AW).

This fifth book listed Clements as heading the "U.K." office of Oriental S.A. A note at the bottom of the page states, "[t]he above named executives are competent enough to answer day-to-day queries. However, in case of unsatisfactory response or for a policy matter, please contact Shamin Ashraf, Vice–President & General Manager (after office hours) ..." DX AW. Oriental U.K. had no brochures of its own. Bokhari would seek to have these brochures handed out wherever he could and authorized Oriental U.K. to hand out the brochures. As a matter of course, brochures of Oriental S.A. were handed out by Rudd and Clements for transactions such as this one. Tr. 398. The same brochures had been mailed by Rudd to Barnard earlier in January or February. Moreover, the U.K. and S.A. offices use the same logo on their letterhead and Bokhari himself considered the U.K. office a "show" office. Tr. 407–08.

By the time of this meeting, the parties anticipated that the first lifting would take place in late April 1984. By April 26, however, no notice of a lifting date had yet been given. Prior to April 26, neither Ree nor Mr. Rosseel had made any contact with anyone in Saudi Arabia, nor had such contact been attempted. On that date, however, without informing Mr. Rosseel, Ree sent a telex to Oriental's office in Jeddah, on the subject of Oriental U.K., which stated:

We are in possession of yr book 'saudi arabian red sea'., kindly offered to us by your mr. stuart rudd of your London branch office.

We would be grateful, indeed, if we can receive a return-telex from you, advising us of the name of the managing-director of your London office as well as the name of the assistant managing director, in order to consult them on some oil supply which is stagnant at the moment.

PX 20.

Ree believed that if the London office was not fulfilling its obligations under the contract, then it was appropriate and necessary to contact a higher authority within the company than Rudd. Based on his conversations with Rudd, Ree believed that Rudd had no superiors in the London office.

That same day, Shamim Ashraf, vice-president and general manager of Oriental S.A., sent a return telex to Ree which stated, "the office manager and secretary of oriental commercial and shipping company (U.K.) limited, is mr. david clements and products trading manager is mr. stuart rudd." PX 21. Sometime shortly thereafter, Ree informed Mr. Rosseel of these telexes, and sent copies of them to Mr. Rosseel.

Also on April 26, Mr. Rosseel sent a letter to Rudd, at Oriental U.K., seeking to confirm a delivery date and expressing the hope that no breach of contract would occur. Mr. Rosseel stated in the letter that "[y]ou will understand that if you fail to [comply with the contract] before these ultimate dates, we will consider this as a substantial shortcoming from your side and

we will be forced to hold you responsible for any detriment resulting from this fact." PX 19. A copy of this letter was sent the next day by telex to the Jeddah office of Oriental S.A. Tr. 251, DX AY. The telex sent began with the statement, "[a]s you know we have concluded on march 7th. last, contract with your organization through your London office for the purchase of 6 cargo's of fuel oil ex bayonne u.s.a. concerning this deal we have sent yesterday following telex to your London office." DX AY. Rosseel received confirmation that the telex was received in the Jeddah office. However, the Jeddah office did not respond in any way to this telex.

In early May, Rosseel had yet to receive the notice of a lifting date for the oil. On or about May 2, Mr. Rosseel sent a telex to Saudi Arabia indicating that Rosseel would accept minor changes in the product quality. That telex indicated that "buyer will open a letter of credit in following words, 3 banking days after irrevocable confirmation of acceptance of all amendments proposed." PX 26. The proposed letter of credit indicated that the seller would be listed as "Oriental Commercial and Shipping Co. (U.K.) Ltd., c/o Oriental Commercial and Shipping Ltd.—P.O. Box 160 Jeddah 21411—Saudi Arabia." PX 26. However, Mr. Rosseel received no response to that telex. An additional telex was sent on May 7 from Rosseel to Oriental U.K., which stated that, "[t]o our regret we note that you do not fulfill the terms of the agreement dd. 07.03.84 between our companies, in spite of our various voluntary concessions. We did not receive any definitive reaction to our telex of 02.05.84. You have not accepted the amendment, which is now no longer valid." PX 29. The letter also indicated that if a response was not received by May 9, Rosseel would initiate legal proceedings to collect approximately $14 million in damages for breach of contract. On May 9, 1984, Mr. Rosseel sent a telex to Jeddah to complain that Oriental U.K. was not performing its part of the contract. That telex stated, "it is clear that you, via your representatives in London, do not meet an important contract and consequently bring great harm to our company (dfr. our telex 84.6963 of 07.05.84 with a provisional estimate)." PX 29. The telex concluded, "[o]ur solicitors have been ordered to take further care of this case. Nevertheless, we urgently expect to receive some kind of reaction from your side." *Id.* Mr. Rosseel believed he was contacting someone in the "group" hierarchy with authority to ensure that Oriental U.K. would fulfill its contractual obligations.

On May 10, Oriental S.A. sent Rosseel a response to the May 9 telex. Directed to the attention of Mr. Rosseel, that May 10 telex, signed by Shamin Ashraf, Vice–President and General Manager, stated, "the alleged dispute is between yr goodselves and Oriental Commercial and Shipping Co., (U.K.) Limited. You are mixing two different entitites." PX 31. This was the first time Mr. Rosseel was told that the British and Saudi Arabian entities should be considered as separate entities.[3]

On May 13, Rietveld sent a telex to Oriental S.A. to claim the commission to which he believed he was due.

On April 19, 1986, Rietveld had a telephone conversation with Rudd, which he recorded on tape, DX V, in which Rietveld indicated that he wanted to arrange a meeting between Rudd and Mr. Rosseel because Rosseel was interested in acquiring Rudd's "contract with Saudi Arabia." *See* DX W. This meant that Mr. Rosseel hoped to pay money to purchase a copy of Rudd's employment contract. In reality, Rudd, in an earlier conversation with Rietveld, had offered to sell a copy of the contract, and although Mr. Rosseel did not want to purchase it, he said it would be good to have the conversation on tape. However, there was no follow up on this topic following that conversation. Rietveld never saw any

---

**3.** The telex sent on March 3, 1984 from Rosseel to Oriental U.K. which said, "nevertheless please note that in the whole matter we are obliged to consider you as principal and that you have to bear your responsibility as such," PX 13, is not inconsistent with the conclusion that the "principal" included the whole group—principal here seems to refer to the entity behind the broker, or the entity who hired the broker to arrange the deal. *See* Tr. 108.

contract between Rudd and Oriental, Saudi Arabia.

Stuart Rudd died on March 30, 1987.

## CONCLUSIONS OF LAW

■ 1. *There was insufficient evidence to show that Oriental U.K. or any of its employees had actual authority to bind Oriental S.A.* Defendant presented no evidence to indicate that the corporate entity Oriental S.A. ever gave Oriental U.K. the power to bind Oriental S.A. to any oil transaction. To the extent Bokhari had a relationship with Oriental U.K., that relationship was not shown to extend to include any authorizations to Oriental U.K. on behalf of Oriental S.A. Indeed, defendant did not show that Bokhari acted in his capacity as a director of Oriental S.A. in any of his various financial dealings with the British corporation. "Actual authority is the result of the principal's consent manifested to the agent." *Wen Kroy Realty Co. v. Public Nat'l Bank & Trust Co.*, 260 N.Y. 84, 91, 183 N.E. 73, 75 (1932).[4] No such manifestation by Oriental S.A. was demonstrated at trial. Even if Oriental U.K. had made contracts on behalf of Oriental S.A., Tr. 363, and even if Oriental U.K. was permitted by Oriental S.A. to collect and retain large sums owed to Oriental S.A., *see* PX 52, p. 10; PX 55, p. 8; DX O, pp. 1–2; Tr. 361–65, there was no evidence to suggest that actual authority was given for the Rosseel transaction or a transaction like it.

■ 2. *Oriental U.K. had apparent authority to bind Oriental S.A. to the Rosseel transaction.* It is well established under New York law that "the existence of 'apparent authority' depends upon a factual showing that [a] third party relied upon the misrepresentation of [an] agent because of

some misleading conduct on the part of the principal—not the agent." *Ford v. Unity Hospital*, 32 N.Y.2d 464, 473, 346 N.Y.S.2d 238, 244, 299 N.E.2d 659, 664 (1973). *See also Chelsea National Bank v. Lincoln Plaza Towers Associates*, 93 A.D.2d 216, 219, 461 N.Y.S.2d 328, 331 (1st Dep't 1983), *aff'd*, 61 N.Y.2d 817, 473 N.Y.S.2d 953, 462 N.E.2d 130 (1984). Indeed, "[t]he very basis of the doctrine of apparent authority indicates that the principal can be held liable under the doctrine only where he was responsible for the appearance of authority in the agent to conduct the transaction in question." *Id.* As Judge Friendly explained:

> Professor Mechem stated many years ago that "[t]he authority of an agent, and its nature and extent ..., can only be established by tracing it to its source in some word or act of the alleged principal. The agent cannot confer authority upon himself or make himself an agent merely by saying that he is one." 1 Mechem, Agency § 285, at 205 (1914 ed.).... As Judge Levet shrewdly observed in *Dr. Beck & Co. v. General Electric Co.*, 210 F.Supp. 86, 90 (S.D.N.Y.1962), *aff'd*, 317 F.2d 538 (2d Cir.1963):
>
> > While agents are often successful in creating an appearance of authority by their own acts and statements, such an appearance does not create apparent authority. Mechem, Agency 61 (4 ed. 1952).

*Karavos Compania Naviera S.A. v. Atlantica Export Corporation*, 588 F.2d 1, 10 (2d Cir.1978). "[T]he existence of 'apparent authority' depends upon the factual showing that the third party relied upon *the misrepresentations of the agent* because of some misleading conduct on the part of the principal." *Ford v. Unity Hospital, supra*, 32 N.Y.2d 464, 473, 346 N.Y.

---

**4.** Although federal law governs the enforceability of the arbitration clause, *see Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 23–26, 103 S.Ct. 927, 941–942, 74 L.Ed.2d 765 (1983), "ordinary principles of contract and agency determine which parties are bound by an agreement to arbitrate." *McAllister Bros. v. A & S Transportation Co.*, 621 F.2d 519, 524 (2d Cir.1980); *see also Fisser v. International Bank*, 282 F.2d 231, 233 (2d Cir.1960).

Without discussion in their memoranda of law, the parties appear to agree, and the Court therefore assumes, that New York law is applicable to the substantive issues raised at trial. *See Gelb v. Royal Globe Insurance Co.*, 798 F.2d 38, 44 n. 5 (2d Cir.1986), *cert. denied*, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987); *cf. Ostano Commerzanstalt v. Telewide Systems, Inc.*, 794 F.2d 763, 765 n. 1. (2d Cir.1986).

S.2d 238, 244, 299 N.E.2d 659, 664 (1973) (emphasis added); *see also Masuda v. Kawasaki Dockyard Co.*, 328 F.2d 662, 665 (2d Cir.1964); *General Overseas Film Ltd. v. Robin International Ltd.*, 542 F.Supp. 684, 688 n. 2 (S.D.N.Y.1982), *aff'd*, 718 F.2d 1085 (2d Cir.1983).

This doctrine of apparent authority is essentially an equitable rule. Thus, "[i]f a third person holds the reasonable belief that the agent was acting within the scope of his authority and changes his position in reliance on the agent's act, the principal is estopped to deny that the agent's act was not authorized." *Masuda v. Kawasaki Dockyard Co.*, 328 F.2d 662, 665 (2d Cir. 1964). As the Second Circuit recognized in *Masuda* and the New York Court of Appeals has emphasized, the "[k]ey to the creation of apparent authority is that the third person, accepting the appearance of authority as true, has relied upon it." *Greene v. Hellman*, 51 N.Y.2d 197, 204, 433 N.Y.S.2d 75, 80, 412 N.E.2d 1301, 1306 (1980). However, "[o]ne who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority." *Ford v. Unity Hospital*, 32 N.Y.2d at 472, 346 N.Y.S.2d at 244, 299 N.E.2d at 664; *see also General Overseas Films, Ltd. v. Robin International, Inc.*, 542 F.Supp. 684, 688 (S.D.N.Y.1982). In other words, "a third party with whom the agent deals may rely on an appearance of authority only to the extent that such reliance is reasonable." *Hallock v. State*, 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 513, 474 N.E.2d 1178, 1181 (1984) (citations omitted). The more extraordinary the transaction, then, the more reasonable becomes a greater degree of inquiry into the status of the apparent agent. *Cf. General Overseas Films*, 542 F.Supp. at 690–92. Indeed, "the principal will not be bound by the act of his agent in excess of his actual authority where the party doing business with the agent knows the extent of the latter's authority, or *where the facts and circumstances are such as to put him on inquiry as to the power and good faith of the agent.*" *Strip Clean Floor Refinish. v. New York Dist. Coun. No. 9*, 333 F.Supp 385, 395 (E.D.N.Y.1971) (emphasis

in original) (citations omitted). Of course, in this regard, the information upon which the appearance of authority is based must be available to the third party at the time of the alleged reliance. Thus, indications of authority recognized after the date of a contract, for example, would be irrelevant to a determination of whether those indications of authority induced a third party to enter the contract in reliance thereon. *See Gumpert v. Bon Ami Company*, 251 F.2d 735, 735 (2d Cir.1958).

It is well established that testimony concerning trade practices and customs is admissible to enable the Court "to evaluate the conduct of the parties against the standards of the ordinary practices in the industry." *Marx & Co., Inc. v. The Diners' Club, Inc.*, 550 F.2d 505, 509 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed. 2d 134 (1977). An inference of agency can be drawn "[o]n the basis of [the principal's] conduct, the relationship of the parties, and *the custom of the industry.*" *Interocean Ship Co. v. National Shipping and Trading Corp.*, 523 F.2d 527, 537 (2d Cir.1975) (emphasis added) *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); *see also Apex Oil Co. v. Vanguard Oil & Service Co., Inc.*, 760 F.2d 417, 422 (2d Cir.1985) (referring with approval to "evidence in the record showing that oil companies routinely negotiate binding contracts over the telephone").

In the case at bar, evidence of trade practice in the fuel oil trading market place is relevant to both the agency and the alter ego issues. Plaintiffs do not address, much less challenge, Rosseel's use of industry practices for the foregoing purposes. Plaintiffs' extended analysis of the circumstances in which parol evidence of trade usage is admissible to explain or supplement a contract term, *see* Post–Trial Memorandum of Law on Behalf of Plaintiffs–Respondents ("Plaintiffs Memorandum") at 9–27, is inapplicable. Contrary to plaintiffs' assertion, Rosseel is not trying to "add to a contract a party which is not named therein or which is not a signatory thereto." Plaintiffs Memorandum at 25. Rather, Rosseel is seeking to hold to the

contract the principal on whose behalf its agent was apparently acting or to pierce the corporate veil.

Applying the above principles to the present case, Oriental S.A. placed Oriental U.K. in a position where it reasonably appeared that Oriental U.K. was authorized to act on its behalf in this transaction, and there was reliance by Rosseel on this apparent authority. Rudd was an experienced trader, known in the oil trading industry. Tr. 117, 225. This was a large transaction—total purchase price exceeded $34 million—and it was naturally important to the brokers that the seller had sufficient resources to support the contract and provide a remedy in case of breach of contract. In this regard, the brokers made inquiries as to the resources and identity of Rudd's company. In response, Rudd sent the Oriental S.A. brochures. With this reassurance, along with the fact that Oriental U.K. and Oriental S.A. were related entities, the deal was consummated.

Oriental S.A. gave Rosseel reason to believe that Oriental U.K. was acting on its behalf. During the relevant period, the main focus of Oriental U.K.'s business was the solicitation of business for Oriental S.A. Bokhari sought to have Oriental S.A. brochures handed out whenever he could and authorized Oriental U.K. to hand out the brochures of Oriental S.A. As a matter of course, brochures of Oriental S.A. were handed out by Rudd and Clements for transactions such as this one, for Oriental U.K. had no brochures of its own. Tr. 398. *See, e.g., Chedd–Angier Production Co. v. Omni Publications International,* No. 81–1188–MA (D.Mass. Jan. 5, 1984) (LEXIS, Genfed library, Dist. file); *American Buildings Co. v. White,* 640 S.W.2d 569 (Tenn.Ct.App.1982) (manufacturer of prefabricated roofing held liable for tortious misrepresentation on the basis of brochures); *Dudley v. Estate Life Insurance Co.,* 220 Va. 343, 257 S.E.2d 871 (1979) (newspaper ads, brochures and business cards sufficient to establish apparent authority). Moreover, Oriental U.K was located in offices claimed by Oriental S.A., used Oriental S.A.'s telephone and telex numbers and shared the same logo.

In the present case, the brokers made inquiries as to the identity and resources of Rudd's company. In response, Rudd provided the Oriental S.A. brochures, which described Oriental S.A. as an "international organization" headquartered in Saudi Arabia with a "branch office" in London. The contents of the brochures were communicated to all the brokers, including Ree, Rosseel's broker, prior to the date of the contract. The brochures stated that Oriental S.A. was engaged in a variety of maritime and fuel oil activities including "trading," and that Oriental S.A. owned ships for transporting oil. One brochure listed Clements as heading the "U.K." office of Oriental S.A. DX AW. A note at the bottom of the page states, "[t]he above named executives are competent enough to answer day-to-day queries. However, in case of unsatisfactory response or for a policy matter, please contact Shamin Ashraf, Vice President & General Manager (after office hours)...." DX AW. These brochures combined with the facts that Rudd worked out of an office which Oriental S.A. claimed to own, used telex and telephone numbers also claimed by Oriental S.A., and shared identical logos created apparent authority in Oriental U.K. Moreover, Bokhari himself considered the U.K. office a "show" office. Tr. 407–08.

■ Furthermore, the inquiries made and reliance by Rosseel were reasonable. The facts and circumstances of this transaction were not such as to put defendant on inquiry as to the power and good faith of the agent. Although large, this transaction was not an "extraordinary" transaction which should have alerted Rosseel to the danger of fraud. There was no evidence that the fuel oil that was the subject matter of the agreement was "unusual." To the contrary, Rietveld knew that this was the kind of product in which Rosseel regularly dealt in the ordinary course of his business. Tr. 172. *Cf. General Overseas Film,* 542 F.Supp. at 689–691 (purported guarantee by a corporation of the debt of an unrelated corporation was extraordinary, and should have alerted the third party to the danger of fraud). Nor should

the brochures have alerted Rosseel that Oriental S.A. "had solicited a very limited business" that did not include oil trading. Plaintiffs' Memorandum at 39. The brochures speak for themselves. They clearly state that Oriental S.A. was engaged not only in bunker supply and ship agency, but in other maritime and fuel oil activities as well, including trading. For example, one brochure states that Oriental S.A. is "actively engaged in Trading;" has "achieved its peak performance in Shipping and Trading,"; and that its employees "are determined to make Oriental most active and fast growing [sic] Shipping and Trading Organization of Saudi Arabia." DX A, p. 2.

In the oil trading business deals are made swiftly and informally, with reliance on personal contacts. Tr. 34–35, 38–39. It is normal not to make personal investigations or credit checks of the seller. Tr. 211, 247. Mr. Rosseel testified as an expert that "if you make a contract with a certain subsidiary of a group or of a company, everyone considers the group, the whole—let's say the whole group. I can't find another word, being behind the deal." Tr. 42. Part of the reason for the insignificance attached to the particular corporate name on the contract is that players in the industry know that some groups of companies have some products available, but for internal reasons—such as tax, organization or distribution—"the confirmation of a deal is done by an office other than the one that negotiated the deal." Tr. 50. Under these circumstances there was nothing to put the brokers on notice of the need to inquire further into Oriental U.K.'s authority and good faith. The brokers had no reason to question Oriental S.A.'s written representations that Oriental U.K. was its branch office. Oriental S.A. authorized Oriental U.K. to distribute these brochures in order to promote Oriental S.A.'s interest. Tr. 399. This allowed Oriental U.K. to look for business on its behalf. Certainly it was reasonable for the brokers to assume that Oriental U.K. distributed the brochures to the brokers for that purpose, especially in light of the fact Oriental U.K. was located in offices owned by Oriental S.A. with the same telex and telephone numbers. The reliance of the brokers on these representations was consistent with oil industry practice and was entirely reasonable.

Finally, the information upon which the appearance of authority is based must be available to the third party at the time of the alleged reliance. *Gumpert, supra* at 735. In the present case, Ree, Rosseel's broker, was aware that Oriental S.A. was the principal. Rudd sent the brochures to Barnard in response to Rietveld's request for more information about his company. Tr. 125–29, 151–52, 155–56. Barnard received the brochures, read each of them and then "phoned Mr. Rietveld." Tr. 152. Barnard told Rietveld that "he received those brochures by mail." Tr. 169. The brokers spoke very frequently with each other during this time. Tr. 138, 165, 224. None of the brokers would have believed Rudd's representations that he was acting for Oriental S.A. without the brochures. Given the industry practice and the fact that Rietveld knew Barnard "as a very dependable trader and broker of high integrity" and had "performed a number of deals with him," Tr. 163–64 there was no reason for Rietveld to doubt Barnard's assurances that the Oriental brochures confirmed Rudd's statements that Rudd worked for Oriental S.A. Similarly, Ree and Rietveld had concluded "around 400 deals." Tr. 223. In the context of these daily and extremely rapid communications among brokers with long-standing relationships and trust, there was no reason to request that the brochures Barnard received from Rudd also be sent to each of the other brokers. Tr. 174. Thus, in the particular context of this industry and this transaction, the written statements of Oriental S.A. and the oral statements of Oriental U.K. that Oriental U.K. was a "branch" office were a reasonable basis for the belief of the brokers, and Rosseel, that Oriental U.K. was acting on behalf of Oriental S.A. *Compare General Overseas Film,* 542 F.Supp. at 689–91 (reliance not reasonable where plaintiff was not the type of company with whom defendant needed to

deal swiftly and the nature of the specific transaction was extraordinary).

■ Plaintiffs argue that the fact Rosseel, itself, did not know the identity of Oriental S.A. prior to the contract date precludes recovery. Plaintiffs' Memorandum at 41–42. However, it is a basic tenet of agency law that the knowledge of an agent received when the agent is acting within the scope of its authority is imputed to the agent's principal. *See, e.g., Arbour Heights, Inc. v. Norman,* 39 A.D.2d 836, 333 N.Y.S.2d 98 (4th Dep't 1972). "In general, the imputation of knowledge from agent to principal flows naturally from the assumption that the agent will live up to the duty to act in the principal's interest in light of all the pertinent information he has acquired." *Marine Midland Bank v. John E. Russo Produce,* 50 N.Y.2d 31, 43, 427 N.Y.S.2d 961, 968, 405 N.E.2d 205, 211 (1980). *See also* Restatement, Agency 2d, § 272, Comment a. "The rationale of the rule has been differently stated by different judges; by some it has been rested entirely upon the presumption of an actual communication between the agent and his principal; by others, upon the legal conception that for many purposes the agent and the principal are regarded as one. Whatever explanation be adopted as the true one, the rule itself is both unquestionable and necessary; the ordinary business affairs of life could not be conducted without it." F. Mechem, *Outlines in Agency* (4th ed. 1952) § 138 p. 90 n. 22.

So it is and must be in the oil trading industry. The uncontroverted testimony showed, in approximately one half of all oil trading transactions, principals rely on their brokers to bring them deals, and brokers do not disclose the identity of principals on the other side in order to protect their commissions. Consequently, principals rely entirely on their brokers to provide them with reliable buyers or sellers. Tr. 35–41. As Mr. Rosseel testified, oil traders "have to rely on" their brokers with respect to "the name and value of the counterpart." Tr. 39. In the oil trading business it is necessary to impute the knowledge of the broker to his principal

regarding the representations of the opposing principal. The oil trading industry simply could not function as it does if the principals were required to investigate independently the identity of opposing principals made known to them for the first time on the contract date or if brokers were required to divulge the identity of the opposing principals prior to the contract date. Tr. 39. Ree was aware that Oriental S.A. was the principal and his knowledge is imputed to Rosseel. Rosseel's reliance on the knowledge of Ree was reasonable and in conformity with oil trading industry practices.

In sum, Oriental S.A. created apparent authority in Oriental U.K., on which Rosseel reasonably relied. As Oriental U.K. had apparent authority to bind Oriental S.A. to the Rosseel transaction, Oriental S.A. is bound to the arbitration agreement.

■ 3. *Oriental U.K. is the alter ego of Bokhari.* A corporation is an entity that is created by law and endowed with a separate and distinct existence from that of its owner. Because a principal purpose for organizing a corporation is to permit its owners to limit their liability, there is a presumption of separateness between a corporation and its owners, *see, e.g., Crown Cent. Petroleum v. Cosmopolitan Shipping Co.,* 602 F.2d 474, 476 (2d Cir.1979), which is entitled to substantial weight. Further, disregarding corporate separateness as an equitable remedy is one that differs with the circumstances of each case.

In determining when a parent or owner may be held liable for the acts of its subsidiary the key is control. "The parent must exercise complete domination 'in respect to the transaction attacked' so that the subsidiary had 'at the time' no separate will of its own, and such domination must have been used to 'commit fraud or wrong' against plaintiff, which proximately caused plaintiff's injury." *American Protein Corp. v. AB Volvo,* 844 F.2d 56, 60 (2d Cir.1988) (*quoting Lowendahl v. Baltimore & Ohio R.R.,* 247 A.D. 144, 157, 287 N.Y.S. 62, 76 (1st Dep't.), *aff'd,* 272 N.Y. 360, 6 N.E.2d 56 (1936)). There are two distinct elements, domination and fraud.

The question has arisen whether the language in *Lowendahl* has been modified by recent decisions of the Second Circuit. Must each of the two elements described above be proven in order to establish liability under the alter ego or instrumentality theory or is proof of only one of the above described elements sufficient to establish liability. The Second Circuit has stated the law in various ways in order to adapt to the particular facts presented and avoid unjust results. In some cases, the Second Circuit has stated *both* domination and fraud are required to pierce the corporate veil, and in other cases the Court held that *either* domination or fraud was sufficient. *Compare Electronic Switching Industries, Inc. v. Faradyne Electronics Corp.,* 833 F.2d 418 (2d Cir.1987) (factors are conjunctive), *Gorrill v. Icelandair/Flugleidir,* 761 F.2d 847 (2d Cir.1985) (factors are conjunctive) with *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.,* 782 F.2d 329, 342 (2d Cir.1986) ([A] must have used [B] to "perpetrate a fraud *or* so dominated and disregarded [B]'s form that the entity primarily transacted [A]'s personal business rather than its own corporate business"), *Kirno Hill Corp. v. Holt,* 618 F.2d 982, 985 (2d Cir.1980) (factors are disjunctive). The Court here will follow the test as enuciated in *American Protein, supra,* which is the most recent decision of the Second Circuit on this matter, and in accord with the original language in *Lowendahl, supra. American Protein* requires both elements be proven to pierce the corporate veil. Moreover, as defendant has established both domination and fraud in this instance either formulation of the test requires piercing the corporate veil.

A. *Oriental U.K. was controlled by Bokhari with respect to the Rosseel transaction.*

■ To satisfy the control element, Rosseel must demonstrate by a preponderance of the evidence that Oriental U.K. was controlled and dominated by Bokhari with respect to the Rosseel transaction to such an extent that it had no separate will of its own or, stated another way, that Oriental U.K. was a mere instrumentality of Bokhari. *American Protein, supra* at 59–60. Although each case must turn on its own matrix of facts a number of factors have been enumerated by the courts as criteria in determining whether the corporate veil should be pierced. These include "(1) the absence of the formalities which are part and parcel of normal corporate existence, *i.e.,* the issuance of stock, the election of directors, the keeping of corporate records, etc., (2) inadequate capitalization, (3) personal use of corporate funds, and (4) the perpetuation of fraud by means of the corporate vehicle." [5] *Walter E. Heller v. Video Innovations, Inc.,* 730 F.2d 50, 53 (2d Cir.1984); *Brunswick Corp. v. Waxman,* 459 F.Supp. 1222, 1228–31 (E.D.N.Y.1978), *aff'd,* 559 F.2d 34 (2d Cir.1979). While this rule emerged in the parent-subsidiary context, the criteria have been carried over in determining whether to pierce the corporate veil in other contexts.

1. Disregard of Corporate Formalities

Courts have given considerable emphasis to disregard of corporate formalities. *See, e.g., Mikropul Corp. v. Desimone & Chaplin–Airtech, Inc.,* 599 F.Supp. 940, 943 (S.D.N.Y.1984). Oriental U.K. was incorporated under the laws of England in September, 1983. Pre–Trial Order ¶ 3(3). At the time Oriental U.K. and Rosseel entered into their agreement, the corporation was only six months old. Under English law [6] an annual meeting of shareholders is mandated; the first one must be held within eighteen months of incorporation. Companies Act § 366(2). Oriental U.K. failed to hold

---

**5.** This final factor will be discussed in section 3(B), *supra.*

**6.** The Court may consider "any relevant material or sources" in determining foreign law. Fed. R.Civ.P. 44.1. The parties have cited provisions of foreign law in their pre-trial briefs thereby giving the required notice of their intention to raise the issue of foreign law. *See Cunard S.S. Co. v. Salen Reefer Services AB,* 773 F.2d 452, 460–61 (2d Cir.1985). Determinations of foreign law by the Court are, of course, conclusions of law. *Indasu International, C.A. v. Citibank, N.A.,* 861 F.2d 375, 379 (2d Cir.1988).

an annual meeting within the requisite time. Pre–Trial Order ¶ 18. Additionally, the Companies Act § 224(4) provides that the "accounting reference period" of a U.K. company begins with the company's date of its incorporation and "is a period of more than 6 months and not more than 18 months; and each successive period of 12 months beginning after the end of the first accounting reference period." Section 242(4) of the Companies Act provides that accounts may be filed ten months after the close of the accounting period except where a company's first accounting period is a period of more than twelve months, in which case the ten month period is reduced by the number of days by which the first accounting period is longer than twelve months. Oriental U.K. filed its first Financial Statement for an initial accounting period of six months, September 15, 1983 to March 31, 1984. PX 48. This statement was filed on October 9, 1985, Pre–Trial Order ¶ 18, eighteen months, rather than ten months as required, after the close of its accounting period. In fact, Clements did not even see a draft of the Financial Statement until his deposition in June, 1985, two and a half months after it was required to be filed, and well after this Court's Order of March 4, 1985. Tr. 348; *Oriental Commercial and Shipping Co. v. Rosseel, N.V.,* 609 F.Supp. 75 (S.D.N.Y. 1985).

However, the Rosseel transaction occurred a mere six months after Oriental U.K.'s incorporation, therefore, it had not, at that time, violated the requisite corporate formalities. As of the date of the contract, Oriental U.K.'s only corporate business had been one "directors' meeting" between Bokhari and his wife. The company secretary, Clements, apparently was not informed of this meeting and did not attend. He was not even certain where it took place, or even if it took place in the United Kingdom. Tr. 351, 416. As of the date of the transaction, Oriental U.K. was not obligated to observe any formality other than filing its incorporation papers. Therefore, this factor is inconclusive. However, the disregard of corporate formalities is only one factor to be considered

in determining whether to pierce the corporate veil. As discussed below, the remaining factors clearly indicate that piercing the corporate veil is mandated.

### 2. Inadequate Capitalization

The adequacy of the capital of the corporation is an additional element to be considered in determining whether to pierce the corporate veil. *See Anderson v. Abbott,* 321 U.S. 349, 362, 64 S.Ct. 531, 538, 88 L.Ed. 793 (1944); *Eagle Transport Ltd., Inc. v. O'Connor,* 470 F.Supp. 731, 733 (S.D.N.Y.1979). Admittedly, although undercapitalization alone is not a sufficient ground for disregarding the corporate form, *Gartner v. Snyder,* 607 F.2d 582 (2d Cir.1979), it nevertheless is an additional factor to be weighed in the balance. However, the mere fact that an entity may or may not have the capital to respond to a potential large award against it does not justify piercing the corporate veil. *See, e.g., Walkovszky v. Carlton,* 18 N.Y.2d 414, 426, 276 N.Y.S.2d 585, 595, 223 N.E.2d 6, 13 (1966). Undercapitalization is measured in terms of the size of the corporate undertaking. *Anderson v. Abbott,* 321 U.S. 349, 362, 64 S.Ct. 531, 538, 88 L.Ed. 793 (1944); *see also Eagle Transport Ltd., Inc. v. O'Connor,* 470 F.Supp. 731, 733 (S.D.N.Y.1979); *Mull v. Colt,* 31 F.R.D. 154, 163–64 (S.D.N.Y.1962). It is particularly important, where, as here, there has been a misrepresentation as to the assets of the company. *See Weisser v. Mursam Shoe Corp.,* 127 F.2d 344, 345–47 (2d Cir. 1942).

The capital of Oriental U.K. was 100 English pounds. In March 1984, the time of the contract with Rosseel, Oriental U.K. had fixed assets with a book value of 44 English pounds. PX 48, p. 9; Tr. 333. For the first fifteen months of its existence, Oriental U.K. was operated from a room in a house owned by Bokhari, for which it paid no rent. Tr. 335–36; PX 55, p. 10. Oriental U.K. began operations with a sum of $100,000 characterized as a loan by Bokhari in November 1983. DX O, p. 2; Tr. 320, 327–28. Further sums characterized as loans of $86,000 were made from April, 1984 through September, 1985. Tr. 387–91.

No written contract exists evidencing obligation of repayment of these sums, and no repayment has been made. Tr. 320. Oriental U.K. depended entirely on periodic sums from Bokhari for funds to pay its operating expenses. Clements understood at the time that any shortfall in ability to meet payroll or other financial obligations would be covered by Bokhari. Tr. 397. Furthermore, it appears that Oriental U.K. did not even own its office furniture and machines as of the date of the Rosseel transaction. Clements testified that he personally owned the office furniture used by Oriental U.K. Tr. 329–30. The office machines and other fixed assets used by Oriental U.K. as of March, 1984, the time of the contract with Rosseel, presumably were purchased by OCE and owned by Oriental S.A. PX 51; PX 52. At the time of its contract with Rosseel, Oriental U.K. paid no rent, no insurance, no subscriptions, nor any "rates" or "service charges." PX 55, p. 10.

Given these limited assets it is clear that Oriental U.K. was undercapitalized. Oriental U.K. is wholly reliant on Bokhari for the operating funds necessary for its continuing existence. As stated above undercapitalization is measured in terms of the size of the corporate undertaking. *Anderson v. Abbott,* 321 U.S. at 362, 64 S.Ct. at 538. Here, Oriental U.K., a company with 100 pounds of operating capital, entered into a 34 million dollar transaction. Clearly, Oriental U.K.'s meager assets compared to the size of the Rosseel transaction demonstrate that Oriental U.K. was undercapitalized.

### 3. Personal Conduct of Corporate Business

Absent special circumstances, limited personal liability cannot be effectuated simply by the act of incorporation. The protection extends only to those transactions which are engaged in by a corporation, for its own purposes, in fact as well as in name. *See, e.g., Port Chester Elec. v. Atlas,* 40 N.Y.2d 652, 389 N.Y.S.2d 327, 357 N.E.2d 983 (1976); *Cooperstein v. Patrician Estates, Inc.,* 97 A.D.2d 426, 465 N.Y. S.2d 53 (2d Dept.1983). If "the corporation is a 'dummy' for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal rather than corporate ends then stockholders must be personally liable and financially responsible as well." *Brunswick Corp. v. Waxman,* 459 F.Supp. 1222, 1230 (E.D.N.Y.1978) (*quoting Walkovszky v. Carlton,* 18 N.Y.2d 414, 418, 276 N.Y. S.2d 585, 588, 223 N.E.2d 6, 8 (1966)), *aff'd,* 599 F.2d 34 (2d Cir.1979); *see also Mikropul Corp., supra* at 943.

Clements stated that it was the "function" of Oriental U.K. to "represent his [Bokhari's] interests." Tr. 318–20. Bokhari and members of his immediate family own all the shares of Oriental U.K., *see* PX 52, p. 6., and both he and his wife are directors of Oriental U.K. Tr. 283. Bokhari is a signatory to Oriental U.K's bank accounts. Tr. 283. As Bokhari himself acknowledged, Oriental U.K. is "not a real business. It is a show business." Tr. 406.

For the first fifteen months of its existence, Oriental U.K. was operated from a room in a house owned by Bokhari, for which it paid no rent. Tr. 335–36; PX 55, p. 10. Oriental U.K. began operations with a sum of $100,000 characterized as a loan by Bokhari in November 1983. DX O, p. 2; Tr. 320, 327–28. Further sums characterized as loans of $86,000 were made from April, 1984 through September, 1985. Tr. 387–91. No written contract exists evidencing obligation of repayment of these sums, and they have not been repaid. Tr. 320. Oriental U.K. depended entirely on periodic sums from Bokhari for funds to pay its operating expenses. In fact, the financing of Oriental U.K. was quite simple. When Oriental U.K. needed further funds to pay salaries and other operating expenses, Clements went to Bokhari and said: "we have expenses of approximately so much. Can you let us have some more money, please." Tr. 397. At the time of its contract with Rosseel, Oriental U.K. paid no rent, no insurance, no subscriptions, nor any "rates" or "service charges." PX 55, p. 10.

In light of the above, the fact that Oriental U.K. had its own bank accounts,

Tr. 283, on which Clements was a signatory; that Clements signed checks on behalf of Oriental U.K., Tr. 284, and approved expense vouchers, Tr. 289; that copies of bank statements were sent only to Oriental U.K. and not Bokhari, Tr. 284–84; and that Oriental U.K. kept its own books, Tr. 285, and had its own auditors, Tr. 287, are of little significance. Oriental U.K. was organized solely to conduct Bokhari's personal business. As Clements testified "incorporation changed nothing" for Oriental U.K. Tr. 320. Indeed, incorporation meant nothing. Oriental U.K. continued to function as it had as the "London office" of Oriental Commercial Establishment, the unincorporated Bokhari entity. Oriental U.K. continued to operate out of Bokhari's house, continued to hand out OCE promotional material, continued to use a telex having the answerback "OCE," continued, in short, to function as the London branch of Bokhari's Saudi operation. However, the mere act of incorporation does not limit Bokhari's personal liability where, as here, the corporation was merely a "dummy" for Bokhari who was, in reality, carrying on his personal business for purely personal rather than corporate ends.

### B. *Oriental U.K. was used by Bokhari to commit a fraud or wrong.*

The elements of fraud are "a representation of fact, which is either untrue and known to be untrue or recklessly made, and which is offered to deceive the other party and induces them to act upon it, causing injury." *Joe Ann Homes at Bellmore, Inc. v. Dworetz,* 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214, 216 (1969); *see also GLM Corp. v. Klein,* 665 F.Supp. 283, 286 n. 3 (S.D.N.Y.1987); *Ressis v. Herman,* 122 A.D.2d 516, 505 N.Y. S.2d 266 (3d Dept.1986).

To satisfy the fraud element, Rosseel must show that Oriental U.K. was used by Bokhari to commit a fraud or wrong that caused Rosseel unjustly to suffer a loss.

*Id.; Williams v. McAllister Bros.,* 534 F.2d 19, 21 (2d Cir.1976). "What the [alter ego] formula comes down to, once shorn of verbiage about control, instrumentality, agency and corporate entity, is that liability is imposed to reach an equitable result." *Brunswick Corp. v. Waxman,* 599 F.2d 34, 36 (2d Cir.1979) (*quoting* Latty, *Subsidiaries and Affiliated Corporations* 191 (1936)).

The manner and circumstances of the representations of Oriental U.K. have previously been described. Bokhari authorized Rudd to hand out the brochures that described Oriental S.A. as an "international organization" headquartered in Saudi Arabia with a "branch" in London. The brochures stated that Oriental S.A. was engaged in a variety of maritime and fuel oil activities including "trading," and that Oriental S.A. owned ships for transporting oil. However, Oriental U.K. is not a "branch" office of Oriental S.A. The distribution of these brochures combined with the location of Oriental U.K. in offices owned by Oriental S.A. and the synomity of telex and telephone numbers misled the brokers and Rosseel as to the identity and resources of the seller.

Plaintiffs' argument that the brochures only authorized Oriental U.K. as an agent for some alleged limited purposes apparent only to plaintiffs is without merit. The denomination of Oriental U.K. as a "branch" office carrys with it certain meaning.[7] Plaintiffs cannot expect third parties to understand from reading these brochures that Oriental was not really a "branch" office but rather an agent for only limited transactions.

Bokhari fully participated in this misrepresentation. He and Oriental S.A. produced and distributed, and authorized Oriental U.K. to distribute the brochures. Bokhari knew that the representation that Oriental U.K. was a branch of Oriental S.A. was untrue. Bokhari made this representation

---

**7.** "Branch" is commonly defined as "a section, department or division of an organization" or "a subordinate or dependant part of a central system or organization." *Webster's Third New International Dictionary* (1971) 267. *Black's Law*

*Dictionary* defines "branch" as a "[d]ivision, office, or other unit of business located at a different location from main office or headquarters." *Black's Law Dictionary* (5th ed. 1979) 170.

either with intent to deceive or with reckless disregard for the consequences of the misrepresentation. As noted above, given the customs of the industry and the fact that Rudd had the Oriental S.A. brochures to back up his assertions, he was completely credible and the brokers and Rosseel's reliance was reasonable.

In sum, Bokhari represented to the world that his London office was part of his Saudi Arabian company. He hired an experienced oil trader known in the industry and permitted him to distribute the Saudia Arabian company's promotional literature representing that the London company is part of the Saudi Arabian company. The representations were reasonably relied on and a large oil deal was entered into. After the deal collapsed, the Saudi Arabian company stated that the London office and Saudi Arabian company were "two different entities." PX 31. Plaintiffs then argued that they were only liable to the extent of the miniscule assets of the London office. Bokhari seeks the benefits of his representation that Oriental U.K. is a branch of Oriental S.A., but denies the liabilities. That is fraud and the Court will not allow the corporate form to be used for such a purpose.

## CONCLUSION

This Court has previously ruled that the arbitration clause in the contract was valid and that this dispute is governed by the arbitration clause. It therefore directed Rosseel and Oriental U.K. to proceed to arbitration. *Oriental Commercial and Shipping Co. v. Rosseel, N.V.,* 609 F.Supp. 75 (S.D.N.Y.1985). The Court now finds both Oriental S.A. and Bokhari are also bound to proceed to arbitration.

However, the March 7 telex contract between the parties includes only a provision requiring arbitration in New York City. PX 1. The contract does not require arbitration by any particular arbitral forum. Therefore, the parties are directed to submit a joint proposal to the Court, 20 days hereafter, on the arbitral forum to which this dispute should be submitted. If the parties cannot agree, the Court will appoint an arbitrator pursuant to 9 U.S.C. § 206.

SO ORDERED.